UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

AARON JORDAN                                    CIVIL ACTION NO:

VERSUS                                          JUDGE

DOWNTOWN DEVELOPMENT DISTRICT,        MAG. JUDGE
CITY OF NEW ORLEANS,  BOARD OF
COMMISSIONERS OF THE DOWNTOWN
DEVELOPMENT DISTRICT,
KURT WEIGLE and KEITH DAVIS

# Complaint and Petition for Damages

The Complaint and Petition for Damages of AARON JORDAN

("Petitioner"), a person of the full age of majority and a resident of the

Parish of Jefferson, State of Louisiana, a citizen of The United States of

America, who files here his Complaint/Petition for Damages against those

made defendants herein, DOWNTOWN DEVELOPMENT DISTRICT, CITY OF NEW

ORLEANS,  BOARD OF COMMISSIONERS OF THE DOWNTOWN DEVELOPMENT

DISTRICT, KURT WEIGLE, and KEITH DAVIS all claimed here responsible for

damaging the Petitioner via their the tortuous acts committed against him,

including but not limited to their Title VII violations of Racial Discrimination,

Hostile Working Environment, Retaliation for Reporting Co-Worker and

Supervisor Fraud, Negligent and/or Intentional Infliction of Emotional

Distress, Wrongful Termination from Employment, and any and all Pendant

and Ancillary Louisiana State Law Tort Claims pursuant but not limited to

Breach of Employment Contract, Louisiana Civil Code Article 2315, as well as

any and all other federal or state tort claims properly set forth as discovery

commences herein - all violations alleged herein occurring related directly to

actions and omissions of others in direct relation to Plaintiff's former

position an employee of the Downtown Development District, as well as

other losses and torts, more fully delineated below.

## STATEMENT OF JURISDICTION

Petitioner is a resident and domicile of Jefferson Parish and the

State of Louisiana, United States of America within this federal judicial

district, and a former employee of the Downtown Development District, a

governmental, political and taxing authority integrated and created as part

of the of the City of New Orleans, a political subdivision created via the

Constitution and laws of the State of Louisiana (hereinafter sometimes

referred to as "the DDD"), for which the Petitioner and defendant actors

were employees, management, Board Members and/or directors of the

defendant DDD.  All violations, and disputes alleged herein involve FEDERAL

statutes, laws and acts, and all controversies occurring and/or originating

within the Eastern District of the State of Louisiana. All violations alleged

herein that are in contention here occurred in direct connection to Plaintiff's former position of employment as a DDD employee in New Orleans (Orleans Parish), Louisiana.

Plaintiff files this lawsuit upon exhaustion of the required Title VII Administrative Process, including but not limited to his timely filed predicate EEOC Complaint, and with the EEOC referring the case to the Louisiana Human Rights Commission ("LHRC"), Case No. 461-2019-02364, and after investigation and deliberations by those agencies, on April 12, 2021, your Petitioner was issued a "Right-to-Sue Letter" from the LHRC, informing Petitioner of his right to bring this civil action an the appropriate state or federal court within 90 days of the April 12, 2021 Letter, which is properly and timely done here.

ADDITIONALLY, Petitioner AARON JORDAN asserts and alleges here that the blatant racial discrimination, retaliation, hostile working environment, acts, actions, omissions and torts described as committed by the defendants here are also in violation of Federal Law Statues prohibiting Racial Discrimination and Interference in Employment mandated by 42 U.S.C. § 1981 (b), and which may be brought within four years of any such offense pursuant to the four-year liberative prescription as allowed in 28 U.S.C. § 165.  All alleged torts and workplace violations have occurred during the

past four tears, and all violations alleged here have occurred within the past four years within the date of filing of this lawsuit.

The alleged violation of United States Code 42 U.S.C. §1981(b), and application of the Federal four-year Liberative Prescription of 28 U.S.C. § 1658 to such violations as claimed for here by Petitioner AARON JORDAN, provides additional grounding for finding of a Federal Question Jurisdiction in this matter.

Petitioner reasonably believes that the quantum value of his claims exceed the $75,000.00  threshold necessary for jurisdiction in United States Court, in addition to the claims being Federal Question and Federal Title VII Employment Discrimination Claims.

Further, all Petitioner AARON JORDAN asserts here that these additional federal law claims arise from the very same facts and allegations, against those same defendants named herein, and further together with the Petitioner's ancillary and pendant respective State Law Claims brought here also, which may rightly be added here as causes of action in this Federal District Court lawsuit and set of claims, with all federal and state law claims adjudicated together here in the interest of consistency and judicial economy, as alleged.

**I.**

The following are named defendants in this suit and are indebted unto your petitioner AARON JORDAN jointly, severally, and *in solido* for such damages as are reasonably equitable, together with legal interest thereon from the date of judicial demand until paid:

A. The DOWNTOWN DEVELOPMENT DISTRICT ("DDD"), a governmental, political and taxing authority integrated and created as part of the local government of the Parish of Orleans and the CITY OF NEW ORLEANS, a municipal/governmental corporation created and functioning under its Home Rule Charter pursuant to the Constitution of the State of Louisiana, and at all times pertinent hereto the governmental entity solely and directly responsible for the conduct and operation of the DDD, for which the Petitioner and defendant actors were employees, management, Board Members and/or directors of the defendant DDD. the Employer of both your Petitioner bringing these claims, as well as the Employer of the named defendant co-workers and supervisors herein, namely defendants KURT WEIGLE and KEITH DAVIS, with defendants DDD CITY OF NEW ORLEANS made defendant here as Petitioner asserts the defendant employer is vicariously liable for the tortuous acts of their defendant employees and the Title VII claims as asserted,  and with this defendant also

liable to Petitioner for any and all other Pendant and Ancillary Louisiana State Law Tort Claims pursuant but not limited to Breach of Employment Contract, Louisiana Civil Code Article 2315, as well as any and all other federal or state tort claims properly reasons set forth here, and as contained within this Petition for Damages filed herein.

B. CITY OF NEW ORLEANS, a municipal/governmental corporation created and functioning under its Home Rule Charter pursuant to the Constitution of the State of Louisiana, and at all times pertinent hereto the governmental entity solely and directly responsible for the conduct and operation of the DOWNTOWN DEVELOPMENT DISTRICT, the Employer of both your Petitioner bringing these claims, as well as the Employer of the named defendant co-workers and supervisors herein, namely defendants KURT WEIGLE and KEITH DAVIS, with defendants DDD and CITY OF NEW ORLEANS made defendant here as Petitioner asserts this defendant employer is vicariously liable for the tortuous acts of their defendant employees and the Title VII claims as asserted,  and with this defendant also liable to Petitioner for any and all other Pendant and Ancillary Louisiana State Law Tort Claims pursuant but not limited to Louisiana Civil Code Article 2315, as well as any and all other federal or state tort claims properly reasons set

forth here, and as contained within this Petition for Damages filed herein.

C. The BOARD OF COMMISSIONERS OF THE DOWNTOWN DEVELOPMENT DISTRICT ("BOARD"), individuals believed the full age of majority and domiciled within the State of Louisiana, appointees to the Board of Commissioners of the DDD which is the managing authority of the operations and personnel management of the defendant employer DDD, with these individual members appointed by the City Council for the City of New Orleans, and with the DDD being governmental, political and taxing authority integrated and created as part of the of the CITY OF NEW ORLEANS, a municipal/governmental corporation created and functioning under its Home Rule Charter pursuant to the Constitution of the State of Louisiana, and at all times pertinent hereto, the defendant Board being directly responsible for the conduct and operation of the DDD, it's management, and employees, with at all times pertinent hereto, the Petitioner and defendant actors were employees, management, Board Members and/or directors of the defendant DDD under direct responsibility of the Board. Petitioner asserts here that the defendant CITY OF NEW ORLEANS, the defendant DDD and the defendant BOARD (hereinafter sometimes collectively referred to as "defendant DDD Management") are all vicariously liable

for the tortuous acts of their defendant employees KURT WEIGLE and KEITH DAVIS for all claims as asserted, and with these defendants knowing of, but not having acted to prevent or otherwise remediate the continuing toxic and hostile working environment created by DDD management and DDD employees under the Board's supervision which damaged your Petitioner as alleged herein, and with these defendants allowing these conditions to persist after being actually and/or constructively placed on notice of the atmosphere of blatant racial discrimination, disparate race-based treatment, hostile working environment, and alienation of fellow employees from the Petitioner due to his race as well as Petitioner's superior work performance, and with these defendants knowing of these illegal conditions, but through their neglect and/or intentional acts allowed the Petitioner to further suffer preventable, continuing negligent and/or intentional infliction of emotional distress, with these   defendants neglecting their responsibility and authority to prevent the above conditions as well as the Wrongful Termination from DDD employment of your Petitioner, and with this defendant also liable to and any and all other Pendant and Ancillary Louisiana State Law Tort Claims pursuant but not limited to Louisiana Civil Code Article 2315, as well as any and all other

federal or state tort claims properly reasons set forth here, and as contained within this Petition for Damages filed herein.

D. KURT WEIGLE – in his capacity as the (former) Chief Executive Officer of the defendant DDD, a person reasonable believed to be a person of the full age of majority and a resident and domicile of the State of Louisiana, and the chief operational manager of the defendant DDD and it's supervisors and employees at all times pertinent hereto, and with this defendant knowing of, but not having acted to prevent or remediate the racially discriminatory and toxic hostile working environment created by other DDD employees under his direct supervision which damaged your Petitioner as alleged here, and with this defendant allowing these conditions to persist after being actually and/or constructively placed on notice of the atmosphere of blatant racial discrimination, disparate race-based treatment, hostile working environment, and alienation of fellow employees from the Petitioner due to his race as well as Petitioner's superior work performance, and with this defendant's knowing neglect and/or intentional acts in allowing the Petitioner to further suffer continuing negligent and/or intentional infliction of emotional distress, and with this defendant presumed the actual decision maker or approving the decision to allow the Wrongful Termination from DDD employment of your Petitioner,

and with this defendant also liable to and any and all other Pendant and Ancillary Louisiana State Law Tort Claims pursuant but not limited to Breach of Contract, Louisiana Civil Code Article 2315, as well as any and all other federal or state tort claims properly reasons set forth here, and as contained within this Petition for Damages filed herein.

E. DDD/City of New Orleans employee KEITH DAVIS – both personally, or, in his capacity as the DDD employee directly responsible for the harassment, a person reasonable believed to be a person of the full age of majority and a resident and domicile of the State of Louisiana, who through his intentional acts inflicted and created a toxic and hostile working environment for the Petitioner, having blatantly criticized, attacked, and creating in the DDD workplace an atmosphere of blatant racial discrimination, disparate race-based treatment, hostile working environment, alienation of fellow employees from the Petitioner due to his race as well as Petitioner's superior work performance, and with this defendant's intentional acts either negligently and/or intentionally inflicting emotional distress upon your Petitioner, as well as playing a significant role in the Wrongful Termination from DDD employment of your Petitioner, and any and all other Pendant and Ancillary Louisiana State Law Tort Claims pursuant but not limited to Louisiana Civil Code Article 2315, as well as any and

all other federal or state tort claims properly reasons set forth here, and as contained within this Petition for Damages filed herein.

**V.**

Petitioner AARON JORDAN, a Caucasian adult male, was hired on October 18, 2018 as a Public Safety Ranger by the defendant Downtown Development District, a tax district/governmental subdivision of the City of New Orleans.  A DDD Public Safety Ranger are unarmed, uniformed employees of the DDD that have duties involving publicly walking the streets of the area of New Orleans city proper containing the designated DDD Tax District, and patrolling the area for problems or to offer assistance to visitors and citizens to that area.

 Prior to his date of hire, Petitioner was interviewed on three separate occasions and submitted to a background check.  During the interview process, Petitioner was interviewed by DDD Ranger supervisors Deidra Simpson, Keith Davis, and Patrick Holden – all African American DDD Supervisors.  In one interview with Deidra Simpson,  she asked Petitioner that since he lived in suburban Metairie, Louisiana and that "Metairie was very pale" (meaning that it is a majority Caucasian area), would he be able to work with people of diverse ethnicities such as those in New Orleans and that the Rangers was an overwhelmingly African American organization. Petitioner explained that he is able to work with people of any race, and

after the three interviews, including questions and statements from the DDD
interviewers assuming that White workers would have problems working with
diverse populations, Petitioner was hired for the position, as one of three
Caucasian Rangers on a team of 20-plus Rangers employed by the DDD during
his tenure with the agency.

**VI.**

On the day Petitioner was hired, another new Ranger was also hired,
Patrick Wiltz, who is African American.  Patrick Wiltz and Petitioner went
through training together and became friendly.  Both were on a 90-day
probationary period beginning from Petitioner's October 18, 2018 date of
hire.  Throughout the interview process and our training phase, DDD Rangers
were told by Ranger supervisors DIEDRE SIMPSON, KEITH DAVIS, DONNIE
CLOUSE, RYAN BURKETT, JARREN ABRON and PATRICK HOLDEN that there
was an ongoing bad practice of some DDD Rangers sitting in hotel lobbies
instead of out patrolling.  This habit of sitting or hiding in hotel lobbies
was pervasive and against the DDD workplace/workforce rules, and DDD
employees were by DDD Management and Supervisors that the Rangers
were to report any such violations to the DDD Ranger Supervisor on duty.

While Petitioner was in training, he observed this habit of fellow
DDD Rangers sitting in hotel lobbies, cafes, restaurants, and grocery stores
by almost every DDD Ranger that he worked or trained with.  These episodes

of sitting were not part of a lunch break or a scheduled break, but simply an act of laziness in violation of DDD Ranger patrol rules.  As a regular part of DDD Ranger duties, all Rangers were tasked with being paired with a co-worker Ranger, and walking the DDD district on two person "patrols" to assist citizens and visitors with directions, guidance, and offer non-policing assistance, as well as to visit local businesses and obtain relevant statistics for DDD records.  Actual visits and work performed were also kept as statistics used to confirm the work performed by each DDD Ranger, and those statistics were then produced to DDD Management for evaluation and presentation to other City of New Orleans governmental overseers, such as the New Orleans City Council and the DDD Board.

## VII.

During Petitioner's tenure with the Rangers, he unwittingly became a "Whistleblower" in that he exposed other DDD Rangers with whom he was paired to work with that did not want to patrol and instead wanted to sit in hotel lobbies, cafés, restaurants, etc.  Petitioner complained and reported these incidents at various times to DDD Supervisors DONNIE CLOUSE (White male), PATRICK HOLDEN (Black male), ANTHONY CARTER (Black male) and RICHARD McCALL (White male), all considered to be the Petitioner's and other DDD Ranger's Supervisors, in good faith believing that he was properly doing the right thing by reporting these irregularities as they occurred.  In

response, Petitioner was also told by Ranger Supervisor PATRICK HOLDEN by

that he was the best performing DDD Ranger, even though he was a new

hire.

On different occasions, it was explained to him by DDD Supervisors

DIEDRE SIMPSON, DONNIE CLOUSE, RYAN BURKETT (White male) and PATRICK

HOLDEN that many other DDD Rangers who had been there for much longer

periods of time did not like Petitioner because his positive work performance

did not reflect well upon them, and because they were being exposed for

having lackluster statistics.  In addition, Petitioner's work performance

productivity and statistics, such as business checks, far exceeded those of

other DDD Rangers, and in fact, his individual statistics revealed greater

work production than much of the any group of the remaining entire DDD

Ranger team of 20+ employees combined.

Some of the Ranger supervisors DIEDRE SIMPSON, RYAN BURKETT,

JARRON ABRON (Black male) and PATRICK HOLDEN then wanted to pair

Petitioner to work with some other, more senior Rangers whom had poor

statistics, for Petitioner to be an example to them and to and show attempt

to improve their job performance. That strategy turned out to be very

problematic as these DDD Rangers, all of whom were African Americans,

began to speak out publicly and relate aloud that they did not want to work

with the Petitioner.  Some of these African American DDD Ranger co-workers

who openly told Petitioner to his face that they did not want to work with

me were JAS NOGESS, LENITA ROBINSON, DEXTER AKINS and BREANNA

O'NEAL, and they also told this to Petitioner's DDD Ranger Supervisors in my

actual presence.

On two occasions, Petitioner was actually paired to work with fellow

DDD Rangers Jas Nogess and Breanna O'Neal, on both separate occasions,

these respective DDD Rangers abandoned and disappeared from the pairing

and left Petitioner alone on patrol, in strict violation of DDD Ranger policies

and instructions.  Petitioner reported these two incidents and violations to

DDD Supervisors, and to his knowledge no measures were ever taken against

these violators of policy.

At the end of the shift involving his being abandoned by DDD Ranger

Breanna O'Neal, Supervisors Ryan Burkett and Patrick Holden encouraged

Petitioner to send an e-mail to Supervisor Donnie Clouse explaining what had

occurred with O'Neill.  Later that night, Petitioner forwarded a detailed e-

mail to Donnie Clouse explaining his experience working with Breanna

O'Neill.

Petitioner also experienced a third incident where an African-

American fellow Ranger Lenita Robinson refused to work with Petitioner and

even told a Supervisor that she would not work with him, mid shift, in his

presence.  Petitioner was then encouraged by Supervisor Patrick Holden to

send an e-mail to Supervisor Donnie Clouse explaining what had occurred

with Lenita Robinson, and the next day, he did send a detailed e-mail to

Donnie Clouse explaining Lenita Robinson's behavior that night.  To the best

of his observations and knowledge, no disciplinary action was taken against

Lenita Robinson by the DDD's upper management.

## VIII.

Petitioner was instructed had reported these incidents to his DDD

Supervisors, who were aware of this discrimination and hostility toward the

Petitioner, but apparently, those in authority did nothing about it during his

tenure of employment.  Petitioner felt alienated and betrayed, as his DDD

Supervisors had told him originally that he should perform his Ranger duties

with diligence, and that he should report irregularities to the Supervisors.

Petitioner privately and frankly spoke to the his DDD Ranger Supervisors

attempting to solve or ameliorate this problem, and these Supervisors

consistently simply told him to go along with the situation and not make a

big protest over these issues, because they would act to solve the problem

and that they recognized Petitioner's good work and examples presented.

The solutions never came for the Petitioner, while his hostile and

discriminatory workplace conditions continued.

## IX.

Petitioner later learned from other DDD Rangers and Supervisors that the fellow DDD Rangers and their hostile attitude towards him was due to the instigation, antagonism, and blatant anti-White rhetoric being spewed in the DDD's break room by an African-American DDD Ranger supervisor, KEITH DAVIS (named defendant here), who openly and verbally incited anti-White racism and racial division against Petitioner and White people in general through his constant, unprovoked and  blatant anti-White statements and criticisms of Petitioners and others on an almost daily basis. Petitioner after several such instances of DAVIS blatant racial comments, criticism of him and Davis' poisoning of the co-worker DDD Rangers against Petitioner, then complained to his DDD Supervisors and PATRICK HOLDEN of defendant KEITH DAVIS' discriminatory statements, but none of them did anything observable about it.

## X.

During Petitioner's  90-day probationary period, he encountered and observed on many occasions some very disturbing workplace practices. Defendant Ranger Supervisor KEITH DAVIS, would constantly sit in the DDD's break room and watch CNN News, and then in the presence of Petitioner and others, he would rail and rant about Donald Trump and "racist White people," "KKK members," and "anybody that voted for Trump."  DAVIS

would curse and say "That mother fucker is going to prison," referring to Donald Trump.  The assumption in his remarks, profanity, body language and gratuitous anger directed at both the TV set and to Petitioner, was that all White people that supported Trump were racists, that because Petitioner was White, he must have been supporting Trump, and that Petitioner was a racist. This implication by DAVIS was unmistakable, was repeated on numerous occasions, and served to further alienate Petitioner from his largely African-American fellow DDD Ranger team.

  When any news story involving any political, or police, or racial issue would be covered by TV news, defendant DAVIS would increase his racist rants against White people, and would in unmistakable terms direct his ranting and venom and criticisms at the Petitioner in his presence, further alienating Petitioner from his largely African-American fellow DDD Ranger team.

## XI.

  This constant racial ranting and raving would go on anytime defendant DAVIS was the supervisor for the shift that Petitioner was working and where DAVIS was one of Petitioner's supervisors.  Defendant DAVIS would not keep these opinions private and would share them with anyone in the DDD breakroom, including all Rangers present and in the presence of the DDD's upper management such as Donnie Clouse, Barbara Waiters, Kurt Weigle,

Sabrina Smith, Shantel McCormick, and Devona Dolliole.  These attacks and

horrible conditions continued for weeks, if not months, and continued long

after Petitioner complained about these intolerable racist attacks and

horrible treatment of him, and continued for weeks if not months after

several members of the DDD upper management and Supervisors either

witnessed defendant DAVIS's attacks firsthand, or were put on notice of

these attacks by complaints made to them by the Petitioner.

These racial verbal rantings by DAVIS can well be described as attacks

upon your Petitioner, and created a very hostile and uncomfortable working

environment for your Petitioner - as in addition for fellow DDD Rangers

refusing to work with him, now had a DDD Supervisor (DAVIS) attacking

your Petitioner in blatantly racial verbal rantings, and with the DDD upper

management and supervisors knowing about these conditions, and to

Petitioner's observations doing nothing to improve or ameliorate this

unlawful workplace condition.

### XI.

Defendant KEITH DAVIS would also repeatedly negatively comment

in the break room about homosexuals, calling them "faggots," but only

around other male Rangers and not DDD upper management, given that DDD

Supervisor Donnie Clouse, who supervises the DDD Ranger program, is openly

gay.  During Petitioner's tenure with the Rangers, he was one of only three

19

whites and the remaining 20+ Rangers were African Americans.  Petitioner

began to realize that defendant DAVIS' ranting and raving in the break room

caused racial divide and created and added to a toxic workplace

environment, and for Petitioner, a Hostile Working Environment.  Defendant

DAVIS' toxicity then transferred over to some of Petitioner's co-worker

African American Rangers, who after DAVIS' began his constant divisive racial

attacks resulted in the co-workers refusing to work with Petitioner.

Adding to this toxic environment was defendant KEITH DAVIS publicly and

repeatedly ridiculing DDD co-worker Ranger Patrick Wiltz, an African-

American male who was openly friendly and supportive of Petitioner and who

openly did not shy away from being paired with Petitioner on Ranger patrols,

and who defendant DAVIS regularly profanely targeted and criticized for

allegedly supporting President Trump.  DAVIS' harassment, profanity,

criticism and abuse for any political preference or affiliation is understood

itself a violation of the DDD's posted policy preventing any employee from

being targeted based on their political affiliation.

    Given the severity and ongoing duration of DAVIS' blatant attacks upon

gay people as well as his continued and frequent criticism of Patrick Wiltz

for befriending Petitioner, as well as Petitioner's complaining of same to

DDD Supervisors and management, the DDD upper management and DDD

Supervisors knew or should have known about these untenable employment

conditions and acted to ameliorate and stop this discriminatory behavior by

DAVIS, but given the notice provided, and continuing duration of these

problems, it is apparent that none of them did anything observable to curtail

or discipline DAVIS for these illegal and inappropriate acts.

## XII.

   During Petitioner's 90-day probationary period, the DDD Management

had employees attend a lecture/class presented to all Rangers and upper

management regarding sexual harassment training.  The class was given by a

contracted outside firm and also covered discrimination, hostile working

environments, and retaliation.  DDD Supervisor Anthony Carter sat in the

class that Petitioner attended and said that the DDD wants employees to feel

free to file a formal complaint without fear of retaliation from management.

DDD Executive Director Kurt Weigle also attended the class and reiterated

Anthony Carter's sentiments.  A handout was given out to each employee

that attended the class and, in addition to the standard protected classes for

discrimination, such as race, religion, ethnicity, age, etc., the stated DDD

policy contained therein also expanded the protections for DDD employees

to include political affiliation and physical appearance/weight. Petitioner

alleges here that the DDD Supervisors and upper management failed to live

up to these stated policies and goals, and allowed Petitioner to be targeted

and discriminated against because of his race as well as for alleged political

beliefs assumed by defendant DAVIS but never espoused by the Petitioner - in direct violation of federal and state law, as alleged herein.

## XIII.

Further increasing these intolerable conditions of hostile working environment and disparate treatment in the workplace, defendant KEITH DAVIS would regularly use his power as a supervisor to only pair himself to work with selected female co-worker Rangers and never male DDD Rangers. On other occasions, DAVIS would disappear for hours with other female DDD Rangers, or refuse to offer assistance or response to contacts from Rangers, including your Petitioner, when necessary. These and other irregularities were DDD work rule policy violations that were repeatedly allowed by DAVIS in favor of selected Rangers, or neglect of his own supervisory duties, which are clearly prohibited by written policy. These are one examples of the chaotic and disparate treatment of the different DDD Ranger employees by management here. This situation was reported to DDD Management, who observably did nothing about it.

## XIV.

On January 5, 2019, while still in his 90-day probationary period, during his DDD Ranger work shift Petitioner was involved in a physical interaction with a person while on his DDD Ranger patrol, that is best described as a self-defense incident.  While out patrolling shortly after

10:00am, Petitioner assisted one NOPD Officer attempting to prevent an obviously unstable individual that was threatening citizens, and who the single NOPD Officer could not subdue alone as he awaited assistance from other NOPD Officers.  During the encounter, Petitioner assisted the NOPD Officer in subduing the subject and preventing that person from injuring the NOPD Officer and other people in the area, with Petitioner injuring his right hand.

Petitioner engaged this person solely because other peoples' lives and safety were in danger. As a human being and a citizen he acted to protect others, within reasonable limits, and did so in good faith rather than indifferently stand by and allow others to be injured when he was in a reasonable position to prevent that from occurring.

Petitioner after this incident was over then went to the DDD offices at 201 St. Charles Ave. to personally inform his Supervisor, defendant KEITH DAVIS, as to what had transpired.  Petitioner then briefly spoke with DAVIS about the incident, with DAVIS stating that he would take care of it and that Petitioner did not have to complete any paperwork reporting the incident. Later that evening, still during his DDD Ranger work shift, Petitioner's right hand began to swell.  At the end of his work shift that night at 10:00 pm, Petitioner went to the UMC Emergency Room to have the injured hand

examined.  Petitioner was notified by UMC's medical staff that his hand was
not broken.

## XV.

A few days later, on his day off, Petitioner received an e-mail
from DDD Supervisor Donnie Clouse regarding the incident and the injury.
Apparently, defendant Supervisor KEITH DAVIS had not taken care of the
matter and did not inform Donnie Clouse or DDD's upper management of the
January 5, 2019 incident.  Instead, Donnie Clouse had heard rumors from
other DDD Rangers regarding the incident, and was seeking information
about it. Petitioner immediately e-mailed Donnie Clouse a detailed
statement of what had transpired.  Several days after sending this e-mail,
Petitioner was called into a very hostile meeting with DDD Executive Richard
McCall in his office.  Richard McCall told Petitioner that he "was wrong for
taking that guy down" and that he didn't care what happened, the Rangers
are not to physically intervene, even if our detailed NOPD Officer is harmed
or in danger.  This incident occurred within Petitioner's 90-day probationary
period, however, Petitioner was not disciplined or terminated from DDD
employment for this incident at any time prior to his later termination from
employment.

## XVI.

Later in January of 2019, Petitioner was paired again on his work shift with Ranger Breanna O'Neal, who once again refused to perform her duties and explicitly refused to work with Petitioner.  This incident was reported during the work shift to DDD Supervisors, who then forced Petitioner to complete the shift without assistance, alone.

A few days later, Petitioner was called into a surprise meeting with DDD Executives Richard McCall and Anthony Carter regarding the work shift incident with Breanna O'Neill.  The nature of the meeting was closed door and hostile.  They informed Petitioner that  O'Neill had surreptitiously recorded an audio segment of Petitioner attempting to coax O'Neal into working with him on the work shift, trying to convince her to properly do her work. Richard McCall said that Petitioner did not have the authority to criticize or discipline Breanna O'Neill on her job performance.  Petitioner responded by then telling them that he believed that Ranger O'Neill was potentially falsifying her statistics based on how she performed when paired with himself and other Rangers.  Anthony Carter then became visibly upset by hearing that information and stopped Petitioner from finishing his explanation regarding falsified statistics.  Richard McCall said that he didn't care if he got rid of both O'Neill and Petitioner because he was "tired of hearing about Rangers not getting along" and "not wanting to work with each other".  Richard McCall went on to say that he instructed the

supervisors to pair Rangers together that did not get along.  Richard McCall

also said that he was aware that defendant KEITH DAVIS had stopped

scheduling O'Neal to work in DDD Zone A, and that DAVIS was instructed by

them to again begin assigning O'Neal to be assigned for work in Zone A, as

are all of the other DDD Rangers.  Richard McCall also in that meeting that

Petitioner was an excellent Ranger.

XVII.

As a result of many co-worker Rangers not wanting to work with

Petitioner, he was only paired to work with very few fellow DDD Rangers.

For the most part, he was assigned to work alone during all hours of the day

and night, despite stated DDD Ranger policy and practice that Rangers

always be paired for safety and performance reasons.  Working on his DDD

Ranger patrols alone, Petitioner was forced to confront multiple intoxicated

homeless people alone in addition to multiple loiterers, panhandlers, and

illegal vendors.  To Petitioner's observations, no other DDD Ranger was

instructed or forced to conduct his DDD Patrols alone.  These acts of DDD

Management themselves were discriminatory, and are prima facie evidence

of racially disparate treatment of this White DDD employee allowed to be

discriminated against and to be isolated and alienated by DDD Management

that approved this disparate treatment, by DDD Supervisor KEITH DAVIS who

blatantly and openly harassed and discriminated against Petitioner due to his

race, and by DAVIS instigating, encouraging and fomenting the atmosphere where fellow DDD Rangers – all African Americans – isolated, alienated, refused to work with Petitioners and in some cases themselves blatantly discriminated against your Petitioner. All of these incidents and episodes of harassment increased Petitioner's upset and workplace discomfort, and further the increased the intensity of the discrimination and hostile working environment experienced by Petitioner.

XVIII.

In February of 2019, after his 90-day Probationary Employment Period had passed, Petitioner was involved in a second physical interaction and self-defense incident.  Petitioner encountered a homeless, middle aged, white male sitting in the middle of the sidewalk on a blanket and playing a guitar, blocking the sidewalk. Petitioner instructed he would have to move. The person then became increasingly hostile and began making verbal profanities and hostile threats towards Petitioner, and raised his guitar in an attempt to strike him.  Petitioner in protecting himself from injury forcefully pushed the person away to protect myself.  The man fell to the ground, and Petitioner held him as a manager from Denali clothing store came outside and called 911.  The manager said that he had witnessed the incident and would provide a statement to the NOPD.  The DDD NOPD Officer arrived and took control of the subject.  The subject had sustained a gash to the back of his

head from hitting the sidewalk and was bleeding.  Petitioner was questioned

by the detail officer and other responding NOPD units from the 8th District.

The witness told a similar version of events and the subject was issued a

summons for simple assault against Petitioner.  The NOPD Officers on scene

found that Petitioner's actions were justified in defending himself.  As all

waited on the scene for EMS to arrive, the subject continued to make threats

to harm Petitioner, while in the presence of the DDD NOPD Officer.  The

subject was later transported to a hospital by EMS.  Supervisors Patrick

Holden and Ryan Burkett then arrived on the scene, and after discussion they

instructed Petitioner to send a text to the DDD Ranger mamagement

detailing what had occurred.  Petitioner then composed himself and sent the

text message.  Petitioner was never questioned about the incident by DDD

Management about this incident.  Petitioner was never disciplined or

terminated from DDD employment for this incident at any time prior to this

incident cited by DDD Management and Supervisors in his later termination

from employment.

### XIX.

Soon thereafter, in February of 2019, Petitioner was invited by DDD

Executive Director Kurt Weigle to say a few words to a group of potential

buyers at the Standard Condominium, since many of the Standard

Condominium  members know him from conducting Ranger business checks

at the building.  While on duty, Petitioner went to the presentation Kurt

Weigle was giving and spoke on behalf of the Rangers and answered

questions from the group.  Kurt Weigle then informed supervisor Ryan

Burkett that Petitioner had done an excellent job in his presentation.

## XX.

Due to the ongoing toxic working environment involving defendant

KEITH DAVIS and the vast majority of fellow DDD Rangers, Petitioner was

frequently scheduled to work his DDD Ranger patrols alone, both day and

night.  He was rarely paired to work with one of only a few African American

Rangers willing to be paired with him.  Petitioner considered this a very

blatant, discriminatory and racially hostile practice – which upset him

profoundly, and this practice by DDD Management was additionally

dangerous and against DDD policy, by subjecting him to blatant emotional

alienation from his fellow DDD Ranger co-workers, due to the ratification of

this discriminatory practice by the DDD Management, and by the actual

increased possibilities of injury or worse in forcing him to conduct his DDD

Ranger patrols having no pairing or assistance or support or response

assistance, as were other similarly tasked co-worker Rangers.  It is a fact

that having the Petitioner regularly assigned to be working alone increased

the risks to him in what could be physically dangerous situations.

One such situation occurred in February of 2019, when while

working alone one night, and assigned to Zone A, the DDD "Hot Spot" due to accumulations of crime incidents and homeless people there, the DDD Rangers did not have a detailed NOPD officer on duty.  Therefore, they did not have police backup and could only call 911 if anything transpired or needed assistance.  The Petitioner as part of his DDD Ranger patrol duties then confronted a group of illegal vendors that the Rangers have to regularly deal with nicknamed as the "drummer kids," whom mainly locate themselves at the corner of Canal & Bourbon Streets. Petitioner began speaking to an adult lady whom the DDD Rangers identify as the "Mother" of the "drummer kids" and once again informing her that the children cannot operate in the downtown area.  This was a repeated problem for DDD Rangers in dealing with the "Mother" and the "drummer kids", as they regularly illegally performed in the DDD and Ranger patrol areas and were familiar to them.

While Petitioner was speaking to th "Mother", an unknown adult male subject who was with her and standing nearby, began engaging in some sort of a hand to hand transaction with another unknown male.  Petitioner suspected this to be some sort of a drug transaction based on how suspicious the two men were acting as he looked on.  Petitioner then instructed both men engaged in the transaction to leave the area also, which Petitioner understood to not be any policy violation or overstepping of his DDD Ranger duties.  The potential purchaser left without incident, however, the possible

seller became agitated.  The potential seller began arguing with the Petitioner, who then urged the seller to leave the area, or police would be summoned by Petitioner.  The seller started to threaten Petitioner and imply that he was going to shoot Petitioner.  In the middle of this verbal disagreement, defendant Supervisor KEITH DAVIS approached Petitioner, who told DAVIS that Petitioner believed that the arguing man was selling drugs. DAVIS didn't seem interested or alarmed and shrugged it off by saying, "Don't worry the State Police will catch up with him," and walked off.

The arguing potential seller stayed in the general area, as Petitioner flagged down a State Police trooper and explained his concerns.  Three State Police troopers then approached the man and searched him for weapons but only found a small amount of marijuana that they instructed him to destroy it.  The State Police troopers did not arrest him but told him to leave the area, which he complied.  Shortly thereafter, defendant DAVIS called Petitioner on the radio and inquired as to his location.  Petitioner replied by telling him that he was now in the 600 block of Canal Street.  Petitioner was not disciplined or terminated from DDD employment for this particular incident at any time, until this incident was cited by DDD Management as grounds for his later termination from employment.

### XXI.

Roughly a week to 10 days later, on the evening of February 21,

2019, Petitioner was paired for his DDD Ranger work shift with co-worker

Ranger Patrick Wiltz.  Both were scheduled on the assignment board to lock

up Heritage Park.  Petitioner asked Patrick Wiltz if he had the key to the

park, because Petitioner didn't.  Wiltz said that he did not.  Petitioner called

Supervisor KEITH DAVIS on the radio to inquire about the key.  DAVIS said

that he had explained it previously to Patrick Wiltz.  However, Patrick Wiltz

told Petitioner that he did not remember what the instructions were.

Petitioner again called DAVIS on the radio to reply that Patrick Wiltz did not

know, and if DAVIS could explain it again on the radio so Petitioner could

hear the instructions.  DAVIS then got very rude and unprofessional with

Petitioner and Patrick Wiltz over the radio and began screaming and berating

both over the radio heard by all the other Rangers.  DAVIS further refused to

explain his previous instructions to Patrick Wiltz to Petitioner, preventing

both from completing our assigned work tasks. DAVIS also viciously and

personally berated and criticized the Petitioner on the open DDD Ranger

radio communication system that was or could be heard by any and all co-

workers, profoundly upsetting your Petitioner.

    That evening at around 9:50 pm, while waiting to clock out at

headquarters and in front of all the Rangers that worked that evening, DAVIS

began making fun of Patrick Wiltz in front of everyone and saying that the

DDD is going to start drug testing soon and that Wiltz must be on drugs

because his memory is so bad.  Petitioner told DAVIS that he did not

appreciate his unprofessional conduct on the radio earlier that evening.

DAVIS personally, insultingly and threateningly challenged Petitioner to get

with him and speak to him anytime about his radio conduct and said that he

hates repeating himself.  This interaction with DAVIS, as well as the public

berating of Petitioner by DAVIS on the open DDD radio system, profoundly

upset your Petitioner to a point where he then was unable to sleep, and

resolved to seel psychological counseling for the ongoing upset and

harassment caused by DAVIS', his co-workers, and the ongoing workplace

mistreatment he had endured for much of his employment tenure to that

point with the DDD.

## XXII.

The next morning, February 22, 2019, at around 8:00am, Petitioner

was under so much mental stress from his encounter the previous night with

DAVIS, as well as accumulated workplace alienation and harassments, that

he called the Ranger phone and spoke to supervisor Ryan Burkett to inform

him that Petitioner was under so much job stress from the DDD Ranger

workplace toxic and hostile working environment that Petitioner

was taking off and using a PTO (allowed leave) day.  Ryan Burkett said

sarcastically that Petitioner could not use a PTO day for stress or because

DAVIS was rude to him the previous night and that he would still have to

come in to work that day.  Petitioner told Ryan Burkett that he was not coming in and that Petitioner had PTO time and that he was using it.  Ryan Burkett then informed that Petitioner would have to return with a doctor's note, which is apparently untrue and not DDD policy.

Petitioner sent a detailed e-mail to Supervisor Donnie Clouse explaining this incident involving work absence with Supervisors Keith Davis and Ryan Burkett.  However, Donnie Clouse was out of the office on vacation.  Further, Petitioner called Ochsner Hospital and made an appointment to seek professional counseling with a psychologist, Dr. Marvin W. Clifford, PhD.  Petitioner was informed by Ochsner that the first available appointment was not until April 8, 2019, at 3:00pm.  Petitioner booked the appointment and later received a letter in the mail from Ochsner confirming the date & time.

### XXIII.

In the early afternoon of February 25, 2019, while Petitioner was at work and out patrolling alone, he received a call on the radio from defendant Supervisor DAVIS for him to come back to the office and meet with DDD Executives Anthony Carter and Richard McCall. Petitioner returned to the DDD offices and was once again placed into a very hostile closed door meeting with Anthony Carter and Richard McCall.  They wanted to question Petitioner about the text message he had sent to Supervisor Ryan Burkett

relative to using a PTO day and not coming to work because of the Rangers toxic and hostile working environment.  At first, Anthony Carter wanted to know if Petitioner was okay and inquired about the incident of February 21st involving defendant Supervisor DAVIS on the radio. Petitioner explained what happened and notified Anthony Carter that he had sent an e-mail to Supervisor Donnie Clouse explaining what occurred.  Petitioner informed Anthony Carter about defendant DAVIS' constant ranting and racial attacks occurring, repeatedly attacking Petitioner as to racist white people and implying that Petitioner was a racist unworthy of trust or respect. Petitioner explained that he believed that this rhetoric was the reason many of the African American Rangers did not want to work with him.

Petitioner also told Anthony Carter that defendant DAVIS only paired himself to work with female Rangers, like Tonie Mallard, and that in the evenings whoever DAVIS is paired with, both will go silent on the radio for hours and no one knows where they are or what they are doing.  defendant DAVIS also told Antony Carter that Keith Davis then shows preferential treatment to the other female Rangers that he works with.  Petitioner also informed Anthony Carter that defendant DAVIS is constantly bulling Ranger Patrick Wiltz in front of others because DAVIS believes that the Petitioner supports Donald Trump.  Petitioner also explained to Carter that co-worker Patrick Wiltz does not want to get into trouble or become targeted so he

does not formally complain about DAVIS' to DDD's upper management, but he tells Petitioner that it bothers Wiltz and that Wiltz had put in a notice to quit the Rangers and accept a job working for the Orleans Parish Sheriff's Office for less pay.

Anthony Carter then asked Petitioner about the earlier incident involving the suspected drug dealer on Canal Street that him told to leave the area. Petitioner explained that this person was connected to the mother of the "drummer kids" and in moving the kids from playing on Canal Street, and that Petitioner had told the man to leave as well because of his suspicious behavior involving a hand to hand transaction that occurred in front of Petitioner. Richard McCall then began chiming in and said that this was why the other Rangers did not want to work with him, because Petitioner was "being too intense" and "too aggressive" in carrying out his duties. The meeting then became very accusatory and shifted from inquiring about the complaint Petitioner I had filed against defendant DAVIS, to then attempting to blame Petitioner for the problems involving the Rangers toxic working environment. Petitioner told Richard McCall that it was not his fault that Ranger Lenita Robinson sat in a hotel lobby for two hours, and that Petitioner had complained about her behavior in December and would not also engage in it, and that's why she did not want to work with him. Petitioner also told Richard McCall that he had a similar problem with Ranger

Breanna O'Neill sitting in hotels and falsifying her stats and that's why she did not want to work with him also.

Petitioner told Richard McCall that he was told in training to report these incidents and now McCall was blaming him for making those reports. And informed Richard McCall that Petitioner's most recent statistics, including the roughly 800 business checks he had conducted, clearly reveals that many of the other DDD Rangers are simply goofing off and that's why they only had roughly 500 cumulative business checks between 20+ Rangers. Anthony Carter replied that in his many years with the DDD, he has never had a Ranger have so many compliments and complaints at the same time.

Petitioner then suggested to Anthony Carter and Richard McCall that the DDD should provide for the Rangers to have a group meeting to facilitate the airing and resolution of personal conflicts between Rangers in order to try to get beyond any misunderstandings that occurred in the past but continue to disrupt the program.  Anthony Carter and Richard McCall scoffed at this suggestion and said that they did not care who got along and who didn't, that the Rangers were being paid to do a job and act like adults. They further said that the only conflicts they knew of between Rangers involved the Petitioner.  Petitioner then told them that there are numerous other Rangers that do not get along and it is well known amongst Rangers and supervisors alike.  The meeting went on like this for nearly one hour.

The meeting finally concluded and they allowed Petitioner to leave and go back on patrol.

### XXIV.

Petitioner finished his work shift and clocked out at 2:00 pm and exited the DDD office.  While Petitioner was exiting the building, he received a phone call from defendant DAVIS who said that Anthony Carter and Richard McCall wanted him to return to the office. Petitioner returned and met again with Anthony Carter and Richard McCall.  Anthony Carter raised his voice and said that they spoke to defendant DDD CEO KURT WEIGLE and the fact that Petitioner had told the suspected drug dealer to leave Canal Street placed myself and the public in danger, and that Petitioner should have called the police instead.  This incident combined with the apprehension Petitioner had made in January of the mentally ill man with a box cutter on Canal Street were the reasons that Petitioner was to be terminated from his position with the DDD immediately.  Anthony Carter also raised another allegation against the Petitioner, where unnamed homeless man supposedly complained to another DDD Ranger that Petitioner threatened him with a collapsible police baton while on duty.  Petitioner told Anthony Carter that this accusation was absolutely false, and that he did not own a collapsible police baton, and had never carried such an item.

Petitioner was thus terminated from his employment position with the DDD without any hearing, or progressive discipline, and for alleged violations that arose from incidents that prior to his termination had never rose to any level of previous discipline, warning or serious admonishment.  Given the comments of DDD Executives McCall and Carter in the two meetings involving Petitioner and his termination from employment, it was openly stated by McCall and Carter that Petitioner's termination from employment was approved, or ordered, by defendant WEIGLE in his position as supervisor and director of all DDD Executives, directors, supervisors and employees, and that all.  Defendant WEIGLE, through his supervision and direction of all DDD employees and supervisors as well as repeated warnings made by Petitioner to DDD Management and Supervisors, either knew of the illegal and discriminatory treatment of your Petitioner, or should have known of same, and through his neglect or approval allowed those illegal and tortuous conditions to exist throughout the entirety of Petitioner's employment with the DDD.

Defendant BOARD OF COMMISSIONERS, through their oversight, hiring authority and operational authority, as well as their ultimate supervision and direction of all DDD employees and supervisors, including defendant WEIGLE and DAVIS, knew or should have know,, and should have acted to prevent, the tortuous and illegal workplace conditions suffered by the Petitioner,

given those repeated warnings made by Petitioner to DDD Management and Supervisors, and the BOARD either knew of the illegal and discriminatory treatment of your Petitioner, or should have known of same, and through his neglect or approval allowed those illegal and tortuous conditions to exist throughout the entirety of Petitioner's employment with the DDD.

Petitioner then left the DDD office and the building and returned a few days later to return my work uniforms, as the DDD requested.


## XXV.

Petitioner asserts that the grounds cited by the DDD Management and decision makers for his termination from employment was pretextual, and instead that he was wrongfully terminated from his position with the DDD as a Ranger because he actually did his job as instructed and as per workplace rules, and that he was forced to endure a Hostile Work Environment involving blatant and open racial abuse from African-American Supervisor  KEITH DAVIS, as well as from many African-American co-workers refusing to work with him, as well as the co-workers' and Supervisors' lack of support and dangerous refusal to assist him when forcing him to patrol alone – against DDD policy, or, when they refused to properly work with and assist him when they did actually perform DDD Ranger patrols with him - again for racially abusive and hostile reasons

Petitioner further asserts that he suffered an ongoing Hostile Work Environment, for racial reasons as well as for Retaliation in his reporting workplace violations and poor performance of his co-workers and immediate supervisor KEITH DAVIS.  Petitioner asserts here that his good faith, honest performance of his work duties exacerbated the Hostile Work Environment and led to my wrongful termination due to the DDD Management, particularly DDD Executive Director Kurt Weigel, seeking a "path of least resistance" in terminating Petitioner rather than addressing the poor performance and workplace policy violations of DDD Ranger co-workers and immediate supervisors, as well as the DDD Management avoiding any confrontation of the blatant racial attacks and hostilities created in the workplace by defendant KEITH DAVIS.

## XXVI.

Petitioner additionally asserts that his termination from his Employment position with the DDD is yet another example of racially discriminatory treatment and racially disparate treatment suffered by him. The January 5, 2019 and February, 2019 incidents of physical self defense were both cited in the meeting February 25, 2019 as grounds for Petitioner's termination from employment.  These incidents cited by the employer are simply a pretext used by the DDD Management, including defendants Kurt Weigel, the Board of Commissioners, and the City of New Orleans, for

Petitioner's termination, as those interactions were in fact justified.  The DDD Management used the pretextual excuses to terminate a White employee who actually did his job, rather than instead of confronting poor performance and ineffectiveness of much of their DDD Ranger program, particularly involving the poor performance and ineffectiveness the largely African American Ranger employees, or the underperforming or fraudulent statistics presented by them to management, or the blatant racism of Supervisor KEITH DAVIS, or the hostility and retaliatory alienation of the Petitioner by the Ranger co-workers.  Instead, the DDD Management found it easier to simply chose the "path of least resistance" in terminating the Petitioner, a White employee, on the pretext of his alleged violation of workplace prohibitions on physical confrontations – however justified (here, with the first instance assisting a lone NOPD Officer in danger of injury, and second, in protecting himself from injury).

Further, Petitioner here offers proof of racially disparate treatment of himself – a White employee, terminated from his position for alleged violations where similarly situated contemporary African American employees involved in worse and/or less justified similar interaction while working as DDD Rangers were not terminated from their positions with the DDD.  Petitioner offers the following examples:

- DDD Ranger Patrick Holden while on duty was involved in at

least two physical altercations with members of the public, and he was not terminated from his position of DDD employment, and remained with employer;

- DDD Ranger Jaron Abron hile on duty was involved in a physical altercation with a member of the public, and was not terminated from his position of employment, and remained with employer;

- DDD Ranger Kendall Armstead while on duty was involved in a physical altercation with a member of the public, and was not terminated from his position of employment, and remained with employer;

- Petitioner in good faith believes that, from anecdotal evidence, that there exist other African American DDD Ranger employees in the recent past that were involved in a physical altercation with a member of the public, and were not terminated from their respective positions of employment, and that proper discovery will reveal these facts and further buttress his claims of a disparate racial treatment in his being singled out for termination on the basis of his race, while others similarly situated were not terminated on the basis of race.

## XXVII.

It is also worth noting that defendant KEITH DAVIS had assured

Petitioner at that time that there was no reason for Petitioner to be

concerned about the January 5, 2019 physical interaction incident, and that

instead defendant DAVIS in fact did not "take care" of reporting or

explaining it to management, and instead allowed the incident to remain

unexplained until word reached upper management and Petitioner was

forced to explain the incident, however belatedly.  Was this an intentional

act by DAVIS to created suspicion or exposure for the Petitioner?

Additionally, defendant KEITH DAVIS was personally present at the

February, 2019 incident involving Petitioner and his confrontation, that was

NOT physical, with the suspected drug dealer, and DAVIS said nothing or did

nothing to de-escalate the interaction or to assist or provide guidance to

Petitioner regarding that interaction.  There was no contact or physical

altercation or interaction here.  Nonetheless, despite Supervisor DAVIS not

finding any reason to admonish or discipline the Petitioner that DAVIS

already having a demonstrated racial and perhaps personal animus against,

DAVIS offered no criticism, correction or discipline here, while DDD

Management conflated this interaction as grounds for the Petitioner's

termination from employment, despite Petitioner never having been

disciplined or subject to progressive discipline for ANY of the three incidents cited by employer as grounds for Petitioner's termination from employment.

## XXVIII.

Petitioner insists that he was subject to disparate treatment, uneven discipline (here, termination with no progressive discipline) as well as blatant racial discrimination and horrible treatment from defendant KEITH DAVIS and by several DDD Ranger co-workers poisoned against Petitioner, and following DAVIS' lead in creating a toxic and racially charged hostile work environment for the Petitioner. These conditions are violative of Title VII, as the represent Title VII instances of prohibited Racial Discrimination, Retaliation, and Hostile Work Environment, as well as related 42 U.S.C. 2000 claims for prohibited racially discriminatory interference and denial of rights to employment, all raised here by Petitioner.  His claims made pursuant to 42 U.S.C. 2000 are as follows:

42 U.S.C. 2000e-2 provides in pertinent part:

(a) Employer practices

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....

Petitioner claims here that the incidents, acts and omissions of all defendants amount to Title VII violations prohibiting Racial Discrimination, Retaliation, and Hostile Work Environment experienced by him for almost the entirety of his DDD employment tenure, as well as incidents, acts and omissions of all defendants violating the federal prohibitions mandated by 42 U.S.C. 2000, which prohibits the racially discriminatory interference and denial of rights to employment fully described by Petitioner in this lawsuit.

In the systemic Disparate Treatment context, the focus shifts from the individual decision maker to the employer as an entity. As with individual Disparate Treatment, the ultimate inquiry remains framed in terms of state of mind. "To succeed on a claim of systemic Disparate Treatment, a plaintiff must show that the employer intentionally discriminated, whether by acting pursuant to an express policy of treating members of different groups differently or, in the absence of an express policy, by engaging in a pattern or practice of discrimination." *See Slack v. Havens*, 522 F.2d 1091, 1092-93 (9th Cir.1975). Because employers rarely adopt expressly discriminatory policies in the face of Title VII, most systematic Disparate Treatment claims are pattern or practice cases – such as sought proven here.

All of those incidents described herein are proof of Racially Disparate Treatment and Retaliatory and/or Wrongful Discharge. At minimum, these incidents are cumulative proof of the Petitioner suffering a Hostile Work

Environment and Racially Disparate Scrutiny and Treatment during his tenure of employment with the defendants here.  At maximum, these incidents stand on their own as separate, actionable causes of action in violation of Title VII.

**XXIX.**

Petitioner further avers here the State of Louisiana tort claims for Breach of Employment, as well as Louisiana Civil Code Article 2315 (the general tort statute) for related claims against the named defendant KEITH DAVIS, where this defendant herein engaged in continuing harassment, racial harassment, racially discriminatory inducements for other co-workers under his supervision to discriminate against your Petitioner.

Plaintiff further asserts here that the defendants liable to Petitioner for State Law Claims involving intentional torts and IIED, on their merits.  La. Civ. Code art. 2315's broad dictate is that: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Here, these defendants acted, and the Petitioner was damaged as fully explained herein.

Further, the La. Civ. Code art. 2324(A) provides that "[h]e who conspires with another person to commit an intentional or willful act is answerable, *in solido*, with that person, for the damage caused by such act." Plaintiff specifically avers here, that the defendant DDD Management

conspired between themselves and/or others to marginalize and ignore the
Petitioner's complaints of continued illegal workplace conditions and
disparate and discriminatory treatment, and instead conspired to terminate
his employment rather than having the DDD confront the larger problems of
blatant racial discrimination against your White Petitioner employee and the
violations made by defendant DAVIS and other employees as described
herein.  Petitioner was subjected over many months to ongoing pattern of
hostile and racially discriminatory work environment, and mistreatment
which was apparent and observable by all observing or put on notice here.
This continuing discrimination against your Petitioner was known to the DDD
Management and essentially ratified by the decision-making DDD
management. The Petitioner asserts here that the defendant employer DDD's
refusal to curtail or end the unlawful behavior of the defendant DAVIS, and
their forcing Petitioner to conduct DDD Ranger patrols alone, and their doing
nothing to correct or curtail or remediate these illegal workplace conditions,
constitutes a ratification or endorsement of those defendant/supervisors'
unlawful behavior by the defendant employer DDD Management, and that
NONE of these tortuous events and behaviors existed in a vacuum, but were
known and allowed to others within DDD Management in an active or docile
conspiracy to ignore and bury these illegal conditions, and to falsely "solve"
those problems by simply terminating the Petitioner from his DDD

employment, in violation of La. Civ. Code art. 2324(A).

## XXX.

As such, defendants KEITH DAVIS, as well as defendant KURT WEIGLE, as well as their employers and directors responsible for their oversight – defendants DDD, CITY OF NEW ORLEANS, and BOARD OF COMMISSIONERS OF THE DDD, are all liable to your Petitioner for affirmatively acting to injure your petitioner, or, failing to properly use their authority and oversight in preventing their employees from discriminating against and damaging your Petitioner as described above, as well as their being vicariously liable to your Petitioner for the actions of their employees and for allowing such unlawful conditions to exist, which damaged your Petitioner.  Additionally, defendant KURT WEIGLE is named defendant here as he is presumably the decision-maker in the decision to terminate Petitioner, given WEIGLE's position as then-Chief Executive Officer of the defendant DDD.

## XXXI.

Petitioner AARON JORDAN avers that as a result of the actions of the defendants as alleged herein, he has suffered loss of his employment position, loss of income, humiliation, shame, indignation and psychological injuries due the ongoing hostile work environment and harassment endured in the DDD workplace and his wrongful and unfair termination, as well as

suffering stress, anger and anxiety that he suffered as a result of the defendants' discriminatory actions and omissions, and makes additional claims for these torts, losses and damages pursuant to Breach of Contract, as well as state law claims referenced herein.

All defendants are liable, jointly, severally and *in solidio*, to your Petitioner herein for all damages flowing from those particular torts, as well as the additional remedies sought here for reinstatement with back pay and full restoration of position, pay, status and benefits, as well as compensatory and general damages as appropriate, together with related benefits and reasonable attorney's fees pursuant to appropriate state and federal law, as well as reimbursement to Petitioner for all costs of bringing these proceedings.

## XXVI.

Petitioner AARON JORDAN avers that as a direct and proximate cause of the aforementioned acts and omissions, he sustained damages, losses, and disability in the following non-exclusive list of particular, and should be allowed and awarded any and all compensation and payment to him for those losses as listed here:

  A. Wrongful Termination of his employment position;

  B. Breach of Implied Employment Contract;

C. Past, present, and future emotional and mental anguish;

D. Costs for any medical treatment or costs incurred;

E. Past, present, and future lost wages, missed work, and damaged job and/or credit rating, and missed employment and/or educational opportunities due to his lost employment;

F. Back pay;

G. Front pay – as Reinstatement is impractical in this instance;

H. Punitive Damages as allowed by Title VII;

I. Loss of reputation, employment prospects, employability, and all other related losses due to slander involved in the wrongful termination;

J. Loss of reputation, employment prospects, employability, and all other related losses due to slander involved in the dissemination to third parties and creation of a public record including those facts while attempting to deny the petitioner unemployment benefits after his wrongful termination;

K. Intentional infliction of emotional distress;

L. Slander and intentional damage to the reputation of your petitioner;

M. Loss of enjoyment of life;

N. Real and future wage losses due to loss of position of employment due to wrongful termination, and the damage to employability due to

slanderous and defamatory claims by employer of terminable offenses in the public and employment records;

O. All losses, compensation and remedies associated with the defendants' wrongful termination of the Petitioner as described herein;

P. Damages to plaintiff's reputation and character due to Wrongful Termination and the additional Slander and Defamation due to groundless claims of terminable offenses or incompetence made by the defendants here;

Q. Reasonable attorney's fees and reimbursement and recovery of all costs of these proceedings;

R. All other damages and/or costs found reasonable through the rendering of this matter.

### XXVII.

These torts committed by the defendant/actors named herein do rise to the level of abusiveness and reasonably presumed desired injury, and intent of the defendant/actors to do same, which are compensable and contemplated by the Louisiana Supreme Court's decision in *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991) and it's progeny, and additionally fall into the fact patterns and circumstances where employers such as the DDD/CITY OF NEW ORLEANS/BOARD OF COMMISSIONERS may be found vicariously liable to their plaintiff employees in tort for the acts and

offenses committed by those plaintiff/employees' co-workers, as contemplated by *Martin v. Bigner*, 665 So.2d 709, La.App. 2 Cir. 12/6/95, (La. App., 1995)

### XXIX.

Further, petitioner AARON JORDAN, in addition to his timely brought TITLE VII claims asserted therein, additionally brings and alleges here that the actions and torts described in violation of Federal Law Statues prohibiting Racial Discrimination and Interference in Employment mandated by 42 U.S.C. § 1981 (b), and which may be brought within four years of any such offense pursuant to the four year liberative prescription mandated in 28 U.S.C. § 165. Petitioner believes that the above federal laws and statutes may be applied to these claims brought here, as they are timely brought in this original lawsuit and Petition for Damages.

WHEREFORE, Petitioner AARON JORDAN prays that the defendants be duly served and cited to appear and answer this petition, all as provided by law; that after legal delays and due proceedings, there be a judgment in favor of the Petitioner and against defendants DOWNTOWN DEVELOPMENT DISTRICT, CITY OF NEW ORLEANS,  BOARD OF COMMISSIONERS OF THE DOWNTOWN DEVELOPMENT DISTRICT, KURT WEIGLE, and KEITH DAVIS, all jointly, severally, and *in solido* to compensate your Petitioner for his loss of

employment position in violation of all federal and state laws and statutes referenced and made applicable as set forth above, all attorney's fees, costs, sanctions and penalties as made applicable under the laws and statutes referenced above, his past, present, and future emotional and mental anguish relative to his wrongful termination and loss of employment, all damage  and loss to his reputation damaging his future employment prospects; past, present, and future lost wages, back pay, front pay, punitive damages as lawfully allowed, all missed work, damaged job and/or credit rating, slander, damage to reputation, and lost employment; loss of enjoyment of life; reasonable compensatory damages together with related benefits and reasonable attorney's fees, and any and all other losses as which may be determined at the trial of this matter, together with legal interest thereon from the date of judicial demand until paid, for all costs of these proceedings and for all general and equitable relief.

Sincerely,

*Dominic N. Varrecchio*

_____
DOMINIC N. VARRECCHIO
Attorney for Petitioner
1539 Jackson Avenue, Suite 100
New Orleans, LA 70130
Louisiana Bar Number 19456
Phone No.: (504) 524-8600

## VERIFICATION AND AFFIDAVIT

I, AARON JORDAN, hereby verify and swear under oath that the claims and allegations made in the foregoing Complaint and Petition for Damages pleadings filed on my behalf here, involving the events and controversies described herein, are true and correct to the best of my knowledge, understanding and recollection.

My attorney Dominic N. Varrecchio is filing this above Complaint and Petition for Damages, based upon the information provided to him by me, as contained therein, which is sworn here by me to be true and correct.

*Aaron Jordan*                              *July 9, 2021*

_____

AARON  JORDAN                                    DATE

SWORN BEFORE ME, UNDER OATH, THIS  9th DAY OF JULY, 2021

*Dominic N. Varrecchio*

_____

DOMINIC N. VARRECCHIO, PUBLIC NOTARY
Attorney, La. Bar No.  19456