U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED     Aug 15, 2023

CAROL L. MICHEL
CLERK

SMS                              Walk-In

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **AARON JORDAN** | * | **CIVIL ACTION NO. 2:21-CV-01323** |
| **VERSUS** | * | **SECTION T** |
| **DOWNTOWN DEVELOPMENT** | * | **JUDGE GREG G. GUIDRY** |
| **DISTRICT, ET AL.** | * | **DIVISION 4** |
| | * | **MAGISTRATE JUDGE KAREN** |
| ***************************** | | **WELLS ROBY** |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Pro-Se Plaintiff, Aaron Jordan, (JORDAN), acting as his own attorney, files here his

Memorandum In Opposition to set forth the reasons this Honorable Court should DENY the

Defendant's, (DDD'S), Motion for Summary Judgment in the instant matter.

I. BACKGROUND:

On October 18, 2018, the Plaintiff, (JORDAN), was hired by the Defendant, (DDD), as a Public

Safety Ranger, after an extensive interview process  **{Exhibit 1}.**  On February 25, 2019, the

Plaintiff, (JORDAN), was terminated from employment by the Defendant, (DDD)  **{Exhibit 2}.**

During one of the interviews conducted by the Defendant, (DDD), the Plaintiff, (JORDAN), was

asked by DDD Ranger Captain Supervisor Deidra Simpson if the Plaintiff, (JORDAN), could

work with diverse people, since the Plaintiff lived in Metairie in Jefferson Parish and that

Metairie was "rather pale," meaning a majority White city.  The Plaintiff, (JORDAN), was hired

at the same time as another African American Ranger named Patrick Wiltz.  Both the Plaintiff

and Wiltz went through training together and became friendly with each other.  The duties of the

TENDERED FOR FILING

AUG 15 2023

U.S. DISTRICT COURT
Eastern District of Louisiana

DDD's Public Safety Rangers included patrolling the downtown area of New Orleans on foot and on bike in order to deter crime, assist tourists, and address quality of life issues for downtown residents, businesses, workers, and tourists.  Although Rangers are non-commissioned, unarmed individuals, the DDD used the Rangers in order to enforce local ordinances relating to quality of life matters involving illegal vending, loitering, aggressive panhandling, obstructing the sidewalks, and urinating in public, among other issues.  While the Plaintiff and Mr. Wiltz were in training, the Plaintiff soon realized that he was the "token," or only White, male Ranger out of a group of approximately 21 Rangers.  While the Plaintiff was in training, he learned that the Defendant, (DDD), has a pervasive problem with Rangers hiding out in hotel lobbies and other downtown businesses for inordinate amounts of time, instead of out patrolling the downtown area.  The Plaintiff and Mr. Wiltz were instructed by the DDD's Donnie Clouse and DDD Ranger Captain Supervisor Deidra Simpson not to take part in such behavior and to report any such behavior, or risk being terminated.  When the Plaintiff completed training and began being paired with other African American DDD Ranger co-workers, the Plaintiff experienced and witnessed this pervasive behavior among most Rangers.  The Plaintiff also experienced and witnessed some of his African American DDD Ranger co-workers inputting phony or false stats into their work phones in order to compensate for the time they had wasted hiding out and not patrolling.  The Plaintiff reported these instances to the DDD's Donnie Clouse, Anthony Carter, Richard McCall, and DDD Ranger Captain Supervisors Diedra Simpson, Patrick Holden, Jarren Abron, and Julius "Ryan" Burkette, as instructed to by the Defendant, (DDD).  However, the Defendant, (DDD), took no action to remedy or correct these problems.  During the course of the Plaintiff's tenure of employment with the Defendant, (DDD), the Plaintiff was subjected to DDD Ranger Captain Supervisor Keith Davis' constant ranting and raving in the DDD's breakroom

about "racist White people." Mr. Davis is an African American and was the Plaintiff's immediate supervisor. Several times a week for the tenure of the Plaintiff's employment with the Defendant, Mr. Davis would sit in the DDD's breakroom and make racist comments about Whites, in the presence of the Plaintiff and the Plaintiff's African American Ranger co-workers. Mr. Davis would make such comments regarding "racist White people," "racist White people who voted for Donald Trump," "KKK members," and "racist White police officers that shoot Black people because they hate them." After this course of anti-White rhetoric was spewed constantly by Mr. Davis in the DDD's breakroom, many of the Plaintiff's African American Ranger co-workers refused to work with him publicly. As a result of their refusal to work with the Plaintiff, the Defendant, (DDD), assigned him to work alone during all hours of the day and night, which is a violation of the DDD's safety policy. While the Plaintiff's African American co-workers were paired in groups of two to patrol downtown New Orleans in order to ensure their safety, the Plaintiff was patrolling alone. The Plaintiff soon realized that by being forced to patrol alone he was being targeted by mentally ill and homeless individuals for physical attack because he was more vulnerable. The Plaintiff complained about being assigned to patrol alone and being placed at greater risk for physical attack to DDD Ranger Captain Supervisors Patrick Holden and Jarren Abron. However, as usual, neither Mr. Holden nor Mr. Abron took any action to remedy the problem. As a result of being forced to patrol alone, the Plaintiff had two (2) separate self-defense incidents, which were investigated by law enforcement, including the Defendant's, (DDD's), own detailed NOPD officers, and deemed to be justified under the circumstances. The Defendant, (DDD), did not terminate the Plaintiff's employment with the DDD following these two (2) separate self-defense incidents. Quite to the contrary, the Plaintiff was referred to by many at the DDD as the "best Ranger," based on the Plaintiff's stats, work

3

ethic, coverage of the downtown area's zones, willingness to assist co-workers, and conducting the most amount of business checks and establishing relationships with downtown businesses. In fact, shortly before the Plaintiff's employment was terminated, the DDD's CEO at the time, Kurt Weigle, asked the Plaintiff to attend a function at The Standard At South Market condo building and address a group of potential buyers, based on the relationships the Plaintiff had established with staff and residents at the building. The Plaintiff had to endure instances of having his African American Ranger co-workers lie about him in order to try to get him terminated form the DDD, refuse to assist him when dealing with aggressive individuals, and leave him during patrols, all in violation of the DDD's safety policies. However, these African American Ranger co-workers were not terminated by the DDD for this behavior or for violating the DDD's safety policies. The Plaintiff also had to endure African American DDD Ranger Captain Supervisor Keith Davis constantly undermining the Plaintiff with his African American co-workers and attempting to sabotage the Plaintiff's job performance by telling the Plaintiff that matters were "taken care of" when, in actuality, Mr. Davis had intentionally ignored these matters so that the Plaintiff's employment would be jeopardized. In another incident, the Plaintiff was on patrol one evening alone for the Defendant, (DDD), when he happened upon a group of illegal vendors well known to the DDD Rangers as the "Drummer Kids." In the process of addressing the "Drummer Kids," an adult male associated with the "Drummer Kids" engaged in a hand to hand transaction with a second adult male right in front of the Plaintiff. The Plaintiff believed this to be a drug transaction and instructed the two men to also leave the area, treating both of them as illegal vendors. The second adult male quickly left the area but the first adult male became angry and began shouting at the Plaintiff. In the midst of this verbal confrontation, DDD Captain Supervisor Keith Davis happens upon the scene. The Plaintiff explained the situation to Mr.

4

Davis, who did not seem interested and took no action.  Mr. Davis did not provide the Plaintiff

with any instructions or with any guidance and simply left the area.  Mr. Davis did not discipline

or reprimand the Plaintiff nor did Mr. Davis report the incident to the Defendant, (DDD).

However, on February 21, 2019, all of that changed.  On the evening of February 21, 2019,

Ranger Captain Supervisor Keith Davis engaged in a tirade of insults over the DDD's radio

directed towards the Plaintiff and his co-worker Patrick Wiltz, who was paired to work with the

Plaintiff for that shift.  Aside from the fact that Mr. Wiltz was an African American Ranger, who

was friendly with the Plaintiff and enjoyed working with the Plaintiff, Mr. Wiltz had stated

publicly to Mr. Davis and others that he voted for and supported Donald Trump.  This admission

by Mr. Wiltz of being a Trump supporter enraged Mr. Davis and Mr. Davis bullied, harassed,

and mocked Mr. Wiltz constantly.  The next two days, on February 22, 2019, and February 23,

2019, the Plaintiff complained to the Defendant, (DDD), about the racist behavior of Mr. Davis

towards the Plaintiff and in the DDD's breakroom.  The Plaintiff was under so much job related

stress from the mistreatment he had been enduring from the Defendant, (DDD), and from Mr.

Davis, that the Plaintiff used a PTO day to take time off from work.  On February 22, 2019, the

Plaintiff made an appointment to seek mental health treatment from a psychologist at Ochsner

Medical Center, Marvin W. Clifford, PhD  **{Exhibit 3}.**  When the Plaintiff returned to work for

the Defendant, (DDD), on February 25, 2019, he was called into a meeting with the DDD's

Director of Administration and Finance Anthony Carter and the DDD's Director of Operations

Richard McCall and terminated from his employment with the Defendant, (DDD), the same day.

The DDD's Anthony Carter and Richard McCall informed the Plaintiff that the reason that he

was being terminated from employment with the DDD was due to the previous incident when the

Plaintiff had addressed the illegal vendors on Canal Street and instructed the suspected drug

dealer to leave the area. The DDD's Anthony Carter and Richard McCall alleged that the Plaintiff acted in a law enforcement capacity and placed himself and the public in danger by doing so. The Defendant, (DDD), now seeks to dismiss the Plaintiff's remaining Title VII claims under a Motion for Summary Judgment.

II.  LAW & ARGUMENT:

First, the Plaintiff submits to the Honorable Court that the Defendant's, (DDD'S), Motion for Summary Judgment and its accompanying Memorandum In Support are fraught with falsehoods, misinformation, hearsay, and even outright lies. On or about August 9, 2023, the Defendant, (DDD), provided Supplemental Discovery Responses and Documents to the Plaintiff's outstanding Discovery requests, in response to the Plaintiff's Amended Motion to Compel Discovery Responses and Amended Motion to Extend Discovery Deadline, which are both pending before Magistrate Judge Karen Wells Roby. These Supplemental Discovery Responses and Documents disprove many facts and arguments contained in the Defendant's, (DDD'S), Motion for Summary Judgment and its accompanying Memorandum In Support. On or about August 11, 2023, the Plaintiff contacted defense counsel Luke LaHaye and gave Mr. LaHaye the option to voluntarily withdraw the Defendant's, (DDD'S), Motion for Summary Judgment due to the numerous falsehoods contained in it, as disproved by the Defendant's, (DDD'S), Supplemental Discovery Responses and Documents. However, Mr. LaHaye refused the Plaintiff's offer to voluntarily withdraw the Defendant's, (DDD'S), Motion for Summary Judgment. Therefore, the Plaintiff has no choice now but to identify each and every falsehood contained in the Defendant's, (DDD'S), Motion for Summary Judgment and its accompanying Memorandum In Support.

III.  THE PLAINTIFF WAS TREATED LESS FAVORABLY BY THE DEFENDANT, (DDD), THAN HIS AFRICAN AMERICAN CO-WORKERS:

In the instant matter, the Defendant, (DDD), and its defense attorneys have pleaded throughout

their Motion for Summary Judgment that DDD Ranger Captain Supervisor Patrick Holden, an

African American, only "had a minor, isolated incident where they [he] had to use defensive

force" and "None were involved in multiple violent physical altercations."  These claims of

material fact by the Defendant, (DDD), and its defense attorneys are provable outright lies, based

on the Supplemental Discovery Responses and Documents recently provided by the Defendant,

(DDD), to the Plaintiff.  According to a written statement initialed by DDD Ranger Captain

Supervisor Patrick Holden, an African American, on January 10, 2019, at approximately 1:35

p.m., Mr. Holden, while on patrol for the Defendant, (DDD), was involved in a self-defense

incident with a male bicyclist in the 700 block of Canal Street, in which Mr. Holden admittedly,

"struck the subject in the head with a closed fist"  **{Exhibit 4}.**  However, this so-called self-

defense incident involving Mr. Holden sounds more like a "free for all" fist-fight, according to a

written e-mailed statement provided by the Defendant's, (DDD'S), own detailed NOPD police

officer, Det.Claudia Bruce, who witnessed the incident involving Mr. Holden.  Det. Bruce e-

mailed her statement of the incident involving Mr. Holden to the DDD's Donnie Clouse the same

day of the incident  **{Exhibit 5}.**  In Det. Bruce's e-mailed statement to the DDD's Donnie Clouse

dated, January 10, 2019, Det. Bruce states that she witnessed Mr. Holden "strike the male with a

closed fist to the back of his head."  The DDD's Donnie Clouse then forwarded this e-mailed

statement from Det. Bruce to both the DDD's Anthony Carter , Richard McCall, and Sabrina

Smith.  Mr. Holden was not terminated from his employment with the Defendant, (DDD), over

this so-called self-defense incident.  However, this is not an "isolated" or "minor" use of

defensive force, as falsely claimed by the Defendant, (DDD), and its defense attorneys.  On

November 9, 2018, DDD Ranger Captain Supervisor Patrick Holden, an African American, was

involved in a second so-called self-defense incident, while on patrol for the Defendant, (DDD),

at approximately 11:32 p.m., in which Mr. Holden, "used an open hand and slapped" a

panhandler well-known to the DDD Rangers named Larry Gardner "in the face to stun him"

**{Exhibit 6}.** This second self-defense incident by Mr. Holden was also investigated by one of

the Defendant's, (DDD'S), detailed NOPD officers, Det. Aaron Harrelson, in which Det.

Harrelson arrested Larry Gardner for "simple battery," and drafted a NOPD incident report Item#

K-11820-18 **{Exhibit 7}.** Det. Harrelson found Mr. Holden's actions to be justified under the

circumstances. Mr. Holden was not terminated from his employment with the Defendant,

(DDD), over this second so-called self-defense incident. In the instant matter, the Defendant,

(DDD), and its defense attorneys have pleaded throughout its Motion for Summary Judgment

and its accompanying Memorandum In Support that DDD Ranger Captain Supervisor Jarren

Abron, an African American, only "had a minor, isolated incident where they [he] had to use

defensive force" and "None violated DDD policy by acting in a law enforcement capacity or

endangered the safety of himself and the public." These claims of material fact by the

Defendant, (DDD), and its defense attorneys are provable outright lies, based on the

Supplemental Discovery Responses and Documents recently provided by the Defendant, (DDD),

to the Plaintiff. On May 19, 2018, at approximately 9:00 p.m., DDD Captain Supervisor Jarren

Abron, an African American, was involved in a self-defense incident in which he acted in a law

enforcement capacity to assist the Defendant's, (DDD'S), detailed NOPD officer Jonathan

Fowlkes, and a second mounted NOPD police officer subdue and arrest a violent adult male,

who had attacked hotel workers at the Roosevelt Hotel. According to Mr. Abron's written

statement dated, May 19, 2018, as "the subject was walking quickly trying to avoid myself and

Officer Fowlkes. I and Officer Fowlkes cut off his walking path where he and the DDD unit was

8

in front of the subject and I was behind the subject on my bike.  While getting off my bike the

subject took a swing at me, as I ducked and fell off of my bike to avoid the powerful contact, the

subject punched the back of my helmet.  I quickly got up and took off after the subject; at that

point I could see the detailed mounted unit approaching fast and Officer Fowlkes running after

the subject and commanding the suspect to get on the ground or he will be tased, as he tried to

get away down Dauphine.  As I ran past Officer Fowlkes I forced the suspect to the ground.

Officer Fowlkes handcuffed him.  I, the mounted Officer, Ranger 5 and Ranger 11 are all on

scene at the moment" **{Exhibit 8}.**  Mr. Abron was not terminated from his employment with

the Defendant, (DDD), over this self-defense incident or from acting in a law enforcement

capacity.  In fact, Mr. Abron, an African American, was promoted to the rank of Captain

Supervisor by the Defendant, (DDD).  In this self-defense incident of May 19, 2018, Mr. Abron

acted in a law enforcement capacity and injected himself during an arrest to assist the

Defendant's, (DDD'S), detailed NOPD officer.  These actions by Mr. Abron are seemingly

identical to the actions of the Plaintiff, (JORDAN), on January 5, 2019, when he acted in a

similar role and capacity to assist the DDD's detailed NOPD officer to subdue a potentially

violent, mentally ill male.  However, Mr. Abron, who is African American, was not terminated

by the DDD and was in fact promoted to the rank of Captain Supervisor by the DDD, while the

Plaintiff, (JORDAN), who is White, was fired by the DDD.  The DDD accused the Plaintiff,

(JORDAN), who is White, of endangering himself and the public by assisting the DDD's detailed

NOPD officer subdue an individual, but somehow the DDD does not accuse Mr. Abron, an

African American, of endangering himself and the public for doing exactly the same thing as the

Plaintiff did.  The DDD accused the Plaintiff, (JORDAN), who is White, of acting in a law

enforcement capacity but somehow the DDD does not accuse Mr. Abron, who is African

9

American, of acting in a law enforcement capacity for doing the exact same thing. Obviously, the Defendant, (DDD), has one set of much more favorable rules, policies, and procedures for African American Rangers, and a different set of less favorable rules, policies, and procedures for the Plaintiff, (JORDAN), who is the "token" White guy. It is obvious that the Defendant, (DDD), has treated the Plaintiff, (JORDAN), less favorably than his African American Ranger co-workers and peers. Despite the Defendant's, (DDD'S), claims, the Plaintiff, (JORDAN), is identical to DDD Ranger Captain Supervisors Patrick Holden and Jarren Abron. The Plaintiff, (JORDAN), was hired by the DDD's Kurt Weigle, Anthony Carter, and Richard McCall, who had all been employed as executives at the DDD for many years prior to the Plaintiff's, (JORDAN'S), hiring. So, in fact, Mr. Holden and Mr. Abron were also hired by Kurt Weigle, Anthony Carter, and Richard McCall, who were the same executives that later hired the Plaintiff, (JORDAN). Another African American Ranger, Bre'Anna O'Neal, who is also identical to the Plaintiff, (JORDAN), in that she was hired to work at the DDD by Kurt Weigle, Anthony Carter, and Richard McCall, was also treated more favorable than the Plaintiff, (JORDAN), who is White. The Defendant, (DDD), allowed Ms. O'Neal to sit for extended periods of time inside of hotel lobbies and other downtown businesses instead of patrol her assigned zones in the downtown area, while the Plaintiff, (JORDAN), was not afforded such an option. The Defendant, (DDD), allowed Ms. O'Neal to not work in Zone 1A, also known to DDD Ranges as the "Hot Spot" because it is so dangerous, which is the 700 block of Canal Street, while the Plaintiff, (JORDAN), was not afforded such an option. The Defendant, (DDD), allowed Ms. O'Neal to input phony or false stats into her work phone in order to make up for the time she spent hiding in hotel lobbies instead of patrolling her assigned zones in the downtown area, while the Plaintiff, (JORDAN), was not afforded such an option. The Defendant, (DDD), allowed Ms.

O'Neal to refuse to work with the Plaintiff, (JORDAN), while the Plaintiff, (JORDAN), was not

afforded the option to pick and choose who he wanted to work with and was oftentimes assigned

to patrol alone.  The Defendant, (DDD), allowed Ms. O'Neal to carry a weapon on patrol, pepper

spray, and did not terminate Ms. O'Neal's employment  **{Exhibit 9},** while the Plaintiff,

(JORDAN), was not treated with similar deference.  In fact, the Defendant, (DDD), falsely

accused the Plaintiff, (JORDAN), of carrying a weapon on patrol, a collapsible baton, based on a

statement made by Ranger Alida Glass, which she allegedly obtained from an unidentified

homeless man, as the DDD was eager to terminate the Plaintiff's, (JORDAN'S), employment

over this false accusation  **{Exhibit 10}.**  The Plaintiff submits to this Honorable Court that there

was no such mysterious homeless man that provided Alida Glass with this complaint.  Instead,

the Plaintiff contends that Ms. Glass manufactured this entire claim to assist the DDD in

terminating the Plaintiff.  Conversely, the Defendant, (DDD), allowed Ranger Bre'Anna O'Neal

to carry pepper spray, a weapon, on duty, but did not terminate her employment.  The Defendant,

(DDD), only provided Ms. O'Neal with a written counseling.  The Defendant, (DDD), allowed

Ms. O'Neal to refuse to assist the Plaintiff, (JORDAN), with tasks during the times in which they

were paired to patrol together, placing the Plaintiff, (JORDAN), at greater risk of physical harm

and physical attack, while the Plaintiff, (JORDAN), was not afforded such an option.  The

Defendant, (DDD), allowed Ms. O'Neal to record a video of the Plaintiff, (JORDAN), without

his knowledge or consent, while he was on patrol for the DDD, and did not terminate Ms.

O'Neal's employment for doing so.  The Defendant, (DDD), allowed Ms. O'Neal to leave the

Plaintiff, (JORDAN), while on patrol, which is a violation of the DDD's safety policies, and did

not terminate Ms. O'Neal's employment, while the Plaintiff, (JORDAN), was not afforded such

an option.  The Defendant, (DDD), allowed Ms. O'Neal to constantly text on her personal cell

phone, while she was on patrol, which is a violation of the DDD's safety policies and resulted in

Ms. O'Neal being struck by a car while on patrol, yet the DDD did not terminate Ms. O'Neal's

employment, while the Plaintiff, (JORDAN), was not afforded such an option.  Another African

American Ranger, Jas Nogess, who is also identical to the Plaintiff, (JORDAN), in that she was

hired to work at the DDD by Kurt Weigle, Anthony Carter, and Richard McCall, was also treated

more favorable than the Plaintiff, (JORDAN), who is White.  The Defendant, (DDD), allowed

Ms. Nogess to falsely accuse the Plaintiff, (JORDAN), of "kicking" a homeless man, when in

fact the Plaintiff, (JORDAN), had only nudged the bottom of the sleeping man's foot with his

foot, as the Plaintiff was trained by the DDD, but the DDD did not terminate Ms. Nogess'

employment.  The Defendant, (DDD), allowed Ms. Nogess to leave the Plaintiff, (JORDAN),

while on patrol, which is a violation of the DDD's safety policies, but did not terminate Ms.

Nogess' employment, while the Plaintiff, (JORDAN), was not afforded such an option.  The

Defendant, (DDD), allowed Ms. Nogess to publicly refuse to patrol with or be paired with the

Plaintiff, (JORDAN), which resulted in the Plaintiff, (JORDAN), having to patrol alone during

both day and night time hours, which is a violation of DDD safety policies, but the DDD did not

terminate Ms. Nogess' employment, while the Plaintiff, (JORDAN), was not afforded such an

option.  Another African American Ranger, Lenita Robinson, who is also identical to the

Plaintiff, (JORDAN), in that she was hired to work at the DDD by Kurt Weigle, Anthony Carter,

and Richard McCall, was also treated more favorable than the Plaintiff, (JORDAN), who is

White.  The Defendant, (DDD), allowed Ms. Robinson to publicly refuse to patrol with or be

paired with the Plaintiff, (JORDAN), which resulted in the Plaintiff, (JORDAN), having to patrol

alone during both day and night time hours, which is a violation of DDD safety policies, but the

DDD did not terminate Ms. Robinson's employment, while the Plaintiff, (JORDAN), was not

afforded such an option. Another African American Ranger, Keith Davis, who is identical to the Plaintiff, (JORDAN), in that he was hired to work at the DDD by Kurt Weigle, Anthony Carter, and Richard McCall, was also treated more favorably than the Plaintiff, (JORDAN), who is White. The Defendant, (DDD), allowed Mr. Davis to bully, harass, intimidate, and ridicule the Plaintiff, (JORDAN), and Patrick Wiltz based on their actual or perceived political party affiliation, which is a violation of DDD policies, but the DDD did not terminate Mr. Davis' employment, while the Plaintiff, (JORDAN), was not afforded such an option.

IV.  THE DECLARATION OF DAVON N. BARBOUR IS FRAUGHT WITH FALSEHOODS, MISINFORMATION, HEARSAY, AND OUTRIGHT LIES:

The Defendant, (DDD), has offered in its Motion for Summary Judgment a signed Declaration by the DDD's CEO Davon N. Barbour, under penalty of perjury, dated, August 1, 2023.

Line Number 16 of Mr. Barbour's Declaration states:  16.  Rangers Jarren Abron and Patrick Holden each were involved in a minor, isolated incident where they had to use defensive force while on duty.

Line Number 19 of Mr. Barbour's Declaration states:  19.  Messrs. Abron, Davis, Holden, and Armstead have not been involved in multiple violent physical altercations.

Line Number 20 of Mr. Barbour's Declaration states:  20.  Messrs. Abron, Davis, Holden, and Armstead have not violated DDD policy by acting in a law enforcement capacity or endangered the safety of himself and the public.

All three of these statements contained in Mr. Barbour's Declaration, dated August 1, 2023, Lines 16, 19, and 20 are flat out lies on the part of Mr. Barbour, the Defendant, (DDD), and its defense attorneys. As cited previously in the Plaintiff's Memorandum In Opposition, Mr. Holden had two (2) separate and violent self-defense incidents while on patrol for the Defendant, (DDD), one incident on January 10, 2019, and another incident on November 9, 2018. Also, on May 19, 2018, Mr. Abron injected himself in a law enforcement matter by subduing a violent individual and assisting the Defendant's, (DDD'S), detailed NOPD officer in arresting the subject.

Furthermore, Mr. Barbour was not the CEO of the DDD, was not employed by the DDD, and did

not even live in the State of Louisiana during the tenure of the Plaintiff's employment with the

Defendant, (DDD). Mr. Barbour did not join the Defendant, (DDD), until the year 2021, and he

has no personal knowledge of this matter whatsoever. Mr. Barbour is offering in his Declaration

hearsay on top of hearsay, and cannot be taken as creditable by this Honorable Court.

## V. THE DECLARATION OF DONALD G. CLOUSE IS FRAUGHT WITH FALSEHOODS, MISINFORMATION, HEARSAY, AND OUTRIGHT LIES:

The Defendant, (DDD), has offered in its Motion for Summary Judgment a signed Declaration

by the DDD's Public Safety Manager Donald G. Clouse, under penalty of perjury, dated, August

1, 2023.

Line Number 15 of Mr. Clouse's Declaration states in pertinent part: 15.  On January 5, 2019, Mr. Jordan inserted himself in a NOPD officer's attempt to subdue an individual.  Mr. Jordan failed to notify any supervisor of this incident....

Line Number 16 of Mr. Clouse's Declaration states in pertinent part: 16.  After this incident, Mr. Jordan was again counseled and reminded that Rangers are not law enforcement personnel and that he should have called the NOPD initially.

Both of these statements contained in Mr. Clouse's Declaration, dated August 1, 2023, Lines 15

and 16 are flat out lies on the part of Mr. Clouse, the Defendant, (DDD), and its defense

attorneys. As cited previously in the Plaintiff's e-mail to the DDD's Donald Clouse dated,

January 8, 2019, the Plaintiff states in his e-mail that, "I reported the incident to Cpt. Keith on

the radio and later in person" **{Exhibit 11}.** Also, the Plaintiff, (JORDAN), repeated this

assertion in his deposition testimony. The Plaintiff, (JORDAN), in his deposition goes further

and states that although he immediately reported the self-defense incident to DDD Ranger

Captain Supervisor Keith Davis, both over the radio and in person, it was Mr. Davis who falsely

told the Plaintiff that the matter would be "taken care of." However, Mr. Davis intentionally did

not "take care" of the Plaintiff's self-defense matter, in order to undermine the Plaintiff and

sabotage the Plaintiff's employment with the DDD because the Plaintiff is White and a resident

of the majority White city of Metairie in Jefferson Parish, which overwhelmingly supported

Donald Trump in the 2016 presidential election.  Next, following the Plaintiff's second self-

defense matter, the Plaintiff, (JORDAN), was not "counseled" by anyone at the DDD over the

incident and was not "reminded" of anything.  This claim is just another flat out lie by the

Defendant, (DDD), and Mr. Clouse.

Line Number 18 of Mr. Clouse's Declaration states in pertinent part: 18.  On February 22, 2019,
Ranger Captain Julius Burkett informed me that he received a call from Mr. Jordan to request
paid time off for his scheduled shift starting at 10:00 a.m. that morning.  Mr. Burkett informed
Mr. Jordan that he was not authorized to approve his request without medical documentation....

Line 18 of Mr. Clouse's Declaration is hearsay.  The Defendant, (DDD), did not obtain a

Declaration from Ranger Captain Julius "Ryan" Burkette, even though Mr. Burkette remains an

employee of the Defendant, (DDD), or did remain an employee of the DDD until just recently.

Further, the DDD's use of PTO does not require "medical documentation," as per the DDD's own

policies.  This is just another flat out lie on the part of the Defendant, (DDD), its defense

attorneys, Mr. Clouse, and Mr. Burkette.  Furthermore, the Plaintiff, (JORDAN), called Mr.

Burkette over two-hours in advance to the start of his shift to request a PTO day off, which is

required by the DDD's policies for using PTO time.

## VI.  THE DECLARATION OF ANTHONY G. CARTER IS FRAUGHT WITH FALSEHOODS, MISINFORMATION, HEARSAY, AND OUTRIGHT LIES:

The Defendant, (DDD), has offered in its Motion for Summary Judgment a signed Declaration

by the DDD's Director of Finance and Administration Anthony G. Carter, under penalty of

perjury, dated, July 31, 2023.

Line Number 7 of Mr. Carter's Declaration states in pertinent part: 7. When Mr. Jordan was
informed that his continued conduct of acting in a law enforcement capacity could result in his
termination, Mr. Jordan began to complain about his allegations of a toxic work environment.

The statement contained in Mr. Carter's Declaration, dated July 31, 2023, Line 7 is a flat out lie

on the part of Mr. Carter, the Defendant, (DDD), and its defense attorneys.  On February 22,

2019, the Plaintiff, (JORDAN), complained in his telephone call to DDD Ranger Captain

Supervisor Julius "Ryan" Burkette of the DDD's toxic work environment and about DDD Ranger

Captain Supervisor Keith Davis' rude behavior from the previous night, and about Mr. Davis'

racist comments made against Whites in front of the Plaintiff in the DDD's breakroom.  Also, the

Plaintiff, (JORDAN), complained about the DDD's toxic work environment, DDD Captain

Supervisor Keith Davis' rude behavior from the previous night, and about Mr. Davis' racist

comments made against Whites in front of the Plaintiff in the DDD's breakroom in the Plaintiff's

e-mail to Donald Clouse dated, February 23, 2019  {**Exhibit 12**}.  So, when the Plaintiff had this

meeting with the DDD's Anthony Carter and Richard McCall, the Plaintiff had already

complained about Mr. Davis, his racist comments against Whites, and the DDD's toxic work

environment, three-days prior and two-days prior, respectively, not just during the meeting of

February 25, 2019.

Line Number 16 of Mr. Carter's Declaration states in pertinent part: 16. After terminating Mr.
Jordan, Sabrina Smith, the DDD's Human Resources Manager, and I met with Mr. Wiltz on
February 27, 2019, about Mr. Jordan's complaints.  Mr. Wiltz categorically denied every
allegation Mr. Jordan made.  Mr. Wiltz further stated that he had no negative incidents with
anyone on at the DDD.  Based on Mr. Wiltz's interview responses, Mr. McCall, Mr. Weigle, and
I determined that Mr. Jordan's allegations were unfounded and closed the investigation.

Line Number 16 of Mr. Carter's Declaration is hearsay.  The Defendant, (DDD), did not obtain a

Declaration from Mr. Wiltz, who allegedly attended this meeting with Mr. Carter and Ms. Smith.

It is very convenient for Mr. Carter to claim that Mr. Wiltz "categorically denied every allegation

Mr. Jordan made," when there is no audio recording of the interview with Mr. Wiltz or a signed

Declaration from Mr. Wiltz.

## VII. THE PLAINTIFF SUFFERED UNDER A HOSTILE WORK ENVIRONMENT & THE REASON GIVEN TO TERMINATE THE PLAINTIFF WAS A PRETEXT & RETALIATION:

As contained in the Plaintiff's, (JORDAN'S), attached Affidavit, deposition, e-mail he sent to the

DDD's Donnie Clouse dated, February 23, 2019, and as plead in the Plaintiff's filed Action, he

was subjected to almost constant racist comments from one of his direct supervisors, DDD

Ranger Captain Keith Davis, in the DDD's breakroom. These racist comments and insults

occurred in front of the Plaintiff by Mr. Davis, while the Plaintiff was the only White person in

the breakroom. For that matter, the Plaintiff was the only or "token" White, male in the entire

Ranger organization. These racist comments and insults also occurred in front of the Plaintiff's

African American Ranger co-workers, which ultimately resulted in many of these African

American Ranger co-workers refusing to work with the Plaintiff, (JORDAN), who is White. The

Defendant, (DDD), stipulates that the Plaintiff, (JORDAN), is White. These racist comments by

Mr. Davis were obviously unwelcomed by the Plaintiff, (JORDAN), who wanted nothing more

than to just go to work, do a good job, and go home. The harassment suffered by the Plaintiff,

(JORDAN), from Mr. Davis was race-based. Mr. Davis' rants in the breakroom were solely

directed towards Whites, never towards any other racial group or ethnicity. Mr. Davis railed

constantly about "racist White people," he never included in his critiques any other race or ethnic

group. As a result of Mr. Davis' constant racist comments about Whites in the DDD's

breakroom, many of the Plaintiff's African American co-workers refused to work with him. The

Defendant, (DDD), should have known about Mr. Davis' racist comments against Whites in the

breakroom, due to the heavy use and traffic of DDD employees and executives through the

breakroom. Furthermore, when the Plaintiff, (JORDAN), finally complained to the Defendant,

(DDD), about Mr. Davis' racist comments against Whites over the past four-months, the DDD's

remedy was to terminate the employment of the DDD's "token" White guy in the Ranger's

17

organization who had complained.  The DDD's remedy was not to terminate Mr. Davis.  By all

accounts, Mr. Davis remains employed by the DDD currently.  The DDD's remedy to stop Mr.

Davis from making racist comments against Whites in the breakroom was for the DDD to

terminate the Plaintiff, (JORDAN), the "token" White guy.  That way, Mr. Davis can continue

making racist comments about Whites in the DDD's breakroom to other African American

Rangers and no one will be there to complain.  As a side note, the DDD has not produced in its

Motion for Summary Judgment a Declaration from Mr. Davis denying the claims that he made

such racist comments on a regular basis in the DDD's breakroom.  This silence from Mr. Davis

in the instant matter is deafening.  Furthermore, the reason that the Defendant, (DDD), gave to

terminate the Plaintiff's employment was a pretext and only made after the Plaintiff complained

about Mr. Davis' racist comments towards Whites on February 22, 2019, and February 23, 2019.

It is astonishing that only three-days (72-hours) after the Plaintiff, (JORDAN), complained about

Mr. Davis' racist comments towards Whites that the DDD decided to terminate the Plaintiff's

employment.  Furthermore, the incident that was used as a pretext was that the Plaintiff had

treated a suspected drug dealer as an illegal vendor and instructed him to leave Canal Street.

However, as contained in the Plaintiff's attached Affidavit and as testified to in the Plaintiff's

deposition, Mr. Davis happened upon the scene in question during the Plaintiff's argument with

this suspected drug dealer.  However, Mr. Davis took no action after coming across this scene.

Mr. Davis provided the Plaintiff with no instructions.  Mr. Davis did not call 911.  Mr. Davis did

not discipline the Plaintiff.  Mr. Davis did not report the incident to the DDD.  Mr. Davis only

reported the incident to the DDD, after the Plaintiff complained about Mr. Davis' racist

comments towards Whites on February 22, 2019, and February 23, 2019, which resulted in the

Plaintiff's termination on February 25, 2019.  So, the Plaintiff was ultimately terminated for an

incident in which he was not disciplined for when it occurred and was already known to Mr. Davis. This termination of the Plaintiff is a clear pretext and retaliation. Using the Defendant's, (DDD'S), argument contained in its Motion for Summary Judgment, as long as the DDD can articulate a non-racial reason to terminate the Plaintiff, then a pretext does not exist. However, as the Plaintiff has pointed out earlier in this Memorandum, DDD Captain Supervisor Jarren Abron, an African American, acted in exactly the same manner as the Plaintiff in assisting the DDD's detailed NOPD officer subdue a violent suspect, but Mr. Abron was promoted to the rank of Captain instead of being terminated as the Plaintiff was.

## VIII.  THE PLAINTIFF WAS SUBJECTED TO DISPARATE TREATMENT BY THE DEFENDANT, (DDD):

As the Plaintiff has noted earlier in his Memorandum, both DDD Ranger Captain Supervisors Patrick Holden and Jarren Abron, who are African Americans, were involved in similar, if not worse, self-defense incidents as the Plaintiff, (JORDAN), had during his tenure of employment with the Defendant, (DDD). However, the Plaintiff, who is White, was terminated by the DDD, while Mr. Holden, an African American, was not terminated and Mr. Abron, an African American, was promoted to the rank of Captain. Having said that, the Plaintiff, (JORDAN), as described in the Plaintiff's attached Affidavit, as testified to in his deposition, and as plead in his filed Action, was assigned by the DDD to patrol alone during both day and night time hours, which is in violation of the DDD's safety policies and procedures. The Plaintiff has included a copy of the DDD's "Ranger Phone List 2019" **{Exhibit 13}.** This list contains the contact information for the 21 Rangers employed during 2019. Each Ranger is assigned a Ranger Number. For example, the Plaintiff, (JORDAN), was assigned the number 2 and was referred to as Ranger 2. Of these 21 Rangers listed, only three (3) are White, to include the Plaintiff, (JORDAN), Alida Glass, and Julius "Ryan" Burkette. The other 17 Rangers listed are African

American.  During the tenure of the Plaintiff's, (JORDAN'S), employment with the Defendant, (DDD), the Plaintiff was scheduled and forced by the DDD to patrol the downtown area alone because many of his African American Ranger co-workers refused to work with him.  During these same shifts, the Plaintiff's, (JORDAN'S), African American co-workers were paired in groups of two for their safety.  In the attached DDD schedules from 2018 thru 2019, the Plaintiff, (JORDAN), identified as Ranger 2, is scheduled to patrol alone by the Defendant, (DDD), during both day and night time hours, which is a violation of the DDD's safety policies  {Exhibit 14}.

For example, in the first attached DDD schedule, for the shift of 6:00 p.m. to 9:00 p.m., Rangers Alida Glass and Bre'Anna O'Neal are paired and Rangers Patrick Wiltz and Antonio Penny are paired, however, the Plaintiff, (JORDAN), is scheduled to patrol alone.  In the second attached DDD schedule, for the shift of 6:00 p.m. to 9:00 p.m., Rangers Bre'Anna O'Neal and Dexter Akins are paired and Rangers Tanika Babineaux and Patrick Wiltz are paired, however, the Plaintiff, (JORDAN), is scheduled to patrol alone.  In the third attached DDD schedule, for the shift of 6:00 p.m. to 10:00 p.m., Rangers Bre'Anna O'Neal and Kendall Armstead are paired, Rangers Alida Glass and Patrick Wiltz are paired, however, the Plaintiff, (JORDAN), is scheduled to patrol alone.  In the fourth attached DDD schedule, for the shift of 6:00 p.m. to 10:00 p.m., Rangers Patrick Wiltz and Bre'Anna O'Neal are paired, however, the Plaintiff, (JORDAN), is scheduled to patrol alone.  In the fifth attached DDD schedule, for the shift of 6:00 a.m. to 10:00 a.m., the Plaintiff, (JORDAN), is assigned to patrol alone and to wake up the morning sleepers alone, which placed the Plaintiff, (JORDAN), in a dangerous position and open to physial attack, while DDD Ranger Captains Keith Davis and Jarren Abron, refused to patrol with the Plaintiff, (JORDAN).  In the sixth attached DDD schedule, for the shift of 6:00 p.m. to 10:00 p.m., Ranger 17, Alida Glass, and Ranger 10, Dexter Akins, are paired, Ranger 7, Lenita

Robinson, and Ranger 22, Tanika Babineaux, are paired, Ranger 21, Patrick Holden, and Ranger 24, Vladjimy Alphonse, ar paired, however, the Plaintiff, (JORDAN), is scheduled to patrol alone.  In the seventh attached DDD schedule, for the shift of 6:00 p.m. to 10:00 p.m., Ranger 11, Bre'Anna O'Neal, and Ranger 25, Antonio Penny, are paired, Ranger 5, Jas Nogess, and Ranger 8, Kendall Armstead, are paired, however, the Plaintiff, (JORDAN), is scheduled to patrol alone.  In the eighth attached DDD schedule, for the shift of 6:00 p.m. to 10:00 p.m., Ranger 22, Tanika Babineaux, and Ranger 11, Bre'Anna O'Neal, are paired, Ranger 7, Lenita Robinson, and Ranger 25, Antonio Penny, are paired, however, the Plaintiff, (JORDAN), Is scheduled to patrol alone.  In the ninth attached DDD schedule, for the shift of 6:00 p.m. to 10:00 p.m., Ranger 22, Tanika Babineaux, and Ranger 25, Antonio Penny, are paired, Ranger 7, Lenita Robinson, and Ranger 24, Vladjimy Alphonse, are paired, however, the Plaintiff, (JORDAN), is scheduled to patrol alone.  This evidence offered by the Plaintiff, (JORDAN), proves disparate treatment that the Plaintiff suffered from the Defendant, (DDD).  Furthermore, although the Plaintiff's, (JORDAN'S), employment with the Defendant, (DDD), was terminated in 2019, a news article posted to the DDD's website in 2020, seemingly admits to the DDD's business and employment practices of favoring African American employees over Whites.  In the 2020 DDD article titled, "DDD Exceeds Its Goal For DBE Participation," the CEO at the time, Kurt Weigle, is quoted as saying, "In the wake of the killing of Mr. George Floyd and the renewed focus on racial equity, I am proud to say that our team has been and continues to be committed to racial & economic justice in every decision we make.  Fairness today and correcting the wrongs of the past is a process that takes commitment and care,"  **{Exhibit 15}.**  This is the anti-White culture of the Defendant, (DDD), and its CEO at the time, Kurt Weigle, in which the Plaintiff was subjected to work under.

21

## IX.  THE PLAINTIFF WAS REPLACED BY THE DDD WITH AN AFRICAN AMERICAN RANGER:

As contained in the Plaintiff's, (JORDAN'S), attached Affidavit, in the month or so following the

Plaintiff's termination from the Defendant, (DDD), the Plaintiff encountered DDD Ranger

Antonio Penny one morning in the downtown area.  Mr. Penny was accompanied by an

unidentified elderly African American male wearing a DDD Public Safety Ranger uniform.  Mr.

Penny informed the Plaintiff, (JORDAN), that he was training this elderly African American

male as the DDD's newest Public Safety Ranger.  Furthermore, in response to the Plaintiff's

Initial Request for the Production of Documents, Number 56, the Defendant, (DDD), supplied a

listing of Rangers hired by the DDD both prior to and following the Plaintiff's termination date

of February 25, 2019.  However, Number 56 requested the DDD to supply each Ranger's

ethnicity or race, which the DDD failed or refused to provide.  In other Discovery responses

provided by the Defendant, (DDD), the DDD claimed that it does not ask Rangers their race or

ethnicity and, therefore, the DDD cannot identify which Rangers are White and which are

African American.  The names and dates of hire of Rangers hired in 2019, subsequent to the

Plaintiff's termination, as provided by the Defendant, (DDD), in Number 56, include:  Rebecca

Coleman (8/7/2019), Zella Dase (3/13/2019), Liliana Harrison-Navarrete (4/12/2019), Julius

Jackson (4/22/19), Haezhel Pena (6/24/2019), Tierra Shawl (6/10/2019), Brandon Smith

(9/24/2019).  However, of these names of Rangers hired subsequent to the date of the Plaintiff's

termination, the Defendant, (DDD), claims in its Discovery responses that it is unable to provide

or identify the race or ethnicity of these employees.  Yet, in Davon N. Barbour's signed

Declaration dated, August 1, 2023, Mr. Barbour now claims that he can identify the races and

ethnicities of these DDD Rangers based on what he describes as "information and belief."

However, for the purposes of providing Discovery responses to the Plaintiff, specifically to

Number 56, the Defendant, (DDD), claimed it was unable to do so. The Plaintiff, (JORDAN), submits to this Honorable Court that both the Defendant, (DDD), and Mr. Barbour are being disingenuous at best in trying to have it both ways. Further, Mr. Barbour claims in his Declaration that in 2019 the DDD hired three Rangers in March and April of 2019. Apparently, Mr. Barbour cannot keep his story straight because, as per the DDD's own Discovery Responses to the Plaintiff regarding Number 56, the DDD hired a total of seven Rangers in 2019. Further, Mr. Barbour claims in his Declaration that "13. When a Ranger is terminated or resigns, the duties of the departed Ranger are distributed among other Rangers, and the DDD may not immediately hire a direct replacement. Instead, the DDD hires additional Rangers based on its general staffing needs." However, that statement by Mr. Barbour is also not true. Again, from the DDD's own Discovery Responses provided to the Plaintiff in Number 56, the first Ranger hired in 2019 was Zella Dase on March 13, 2019. Zella Dase was hired only days after the Plaintiff, (JORDAN), was terminated on February 25, 2019. Zella Dase then resigned a few days after being hired on March 24, 2019. The DDD then hires Liliana Harrison-Navarrete and Julius Jackson days later, on April 12, 2019 and April 22, 2019, respectively.

## X. THE PLAINTIFF, (JORDAN), WAS UNJUSTLY TERMINATED FROM HIS SUBSEQUENT EMPLOYMENT WITH SEB SECURITY:

The Defendant, (DDD), argues in its Motion for Summary Judgment that the Plaintiff, (JORDAN), should not be entitled to back pay and front pay because he was terminated from his subsequent employment with SEB Security for cause. This is incorrect. After the Plaintiff was terminated from the Defendant, (DDD), he managed to secure employment with SEB Security as an undercover loss prevention agent. The job at SEB Security consisted of the Plaintiff dressing in plain clothes to pose as a shopper at local Walgreens store locations, in order to detect and apprehend shoplifters. During one shoplifting incident at a Walgreens store in Algiers, the

Plaintiff had stopped two teenagers.  The two teens were engaged in a theft, or an attempted theft, at the store.  The Plaintiff identified himself and approached the two teens.  The two teens immediately said that their mother was waiting outside in her car and that they wanted to call her to come inside the store.  The Plaintiff waited with the two teens until their mother entered the store, while carrying a newborn baby in her arms.  Between the time it took for the teens to call their mother and their mother to enter the store, the male teen retrieved a pack of condoms from his pocket and placed it back on the shelf.  The female teen was holding a jar of hair gel.  Upon the mother entering the store, she immediately began accusing the Plaintiff and the female store manager of falsely accusing her children of stealing.  Based on the mother having a newborn baby in her arms, the Plaintiff informed her that Walgreens was not going to press charges, however, her children cannot come back to this Walgreens location.  The Plaintiff walked away and allowed the mother to speak with the female store manager.  After a lengthy discussion in the store, the mother and her two teenagers left without making a purchase.  At no time during her discussion did the mother accuse the Plaintiff of making any kind of inappropriate comment towards her.  A few days later, the Plaintiff was informed by SEB Security that he had been terminated.  After speaking to his immediate supervisor and SEB Security's regional supervisor, the Plaintiff was informed that the mother from the Algiers Walgreens store had accused the Plaintiff of making a "bad stop" with her two children and of making a sexually explicit comment towards her.  The Plaintiff denied any such thing happened, especially since he had only interacted with the mother for a short time.  Further, the female store manager never said anything about the mother complaining to her about any such comment made by the Plaintiff.  The Plaintiff informed SEB Security that the mother was obviously lying.  In response, the

Plaintiff filed a lawsuit in Second City Court's Small Claims Division against Walgreens for defamation, libel, and slander. The matter was settled in the Plaintiff's favor and closed.

## XI. CONCLUSION:

Accordingly, considering the foregoing arguments, evidence, and cited law, the Plaintiff, (JORDAN), prays that this Honorable Court will DENY the Defendant's, (DDD'S), Motion for Summary Judgment in the instant matter, as the Plaintiff, (JORDAN), has demonstrated that there are genuine and material issues of fact yet to be decided at Trial, relating to his Title VII claims.

Respectfully Submitted,

AARON J. JORDAN
Pro-Se Plaintiff
2005 Taft Park
Metairie, LA  70001
Phone:  (504)-491-0253
E-mail:  AJ2INVESTIGATE@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing to the Defendant, (DDD), through its attorney of record, Luke LaHaye, via electronic mail, or e-mail, and/or U.S. Mail on Tuesday, August 15, 2023.

AARON J. JORDAN