UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| AARON JORDAN | * | CIVIL ACTION NO. 2:21-CV-01323 |
| | * | |
| VERSUS | * | SECTION T |
| | * | |
| DOWNTOWN DEVELOPMENT DISTRICT, CITY OF NEW ORLEANS, BOARD OF COMMISSIONERS OF THE DOWNTOWN DEVELOPMENT DISTRICT, KURT WEIGLE, AND KEITH DAVIS | * * * * * * | JUDGE GREG G. GUIDRY  DIVISION 4  MAGISTRATE JUDGE KAREN WELLS ROBY |
| * * * * * * * * * * * * | | |

**ORDER AND REASONS**

The Court has before it Defendant Downtown Development District's ("DDD") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.[1] *Pro se* Plaintiff Aaron Jordan has filed a memorandum in opposition.[2] Having considered the parties' briefing, as well as the applicable law and facts, the Court will GRANT DDD's Motion.

**I.    BACKGROUND**

The municipality DDD is a "special taxing district within the City of New Orleans" created by the Louisiana legislature in 1974 with the goal of improving that neighborhood (the "District") and spurring economic growth.[3] DDD employs what it describes as a "noncommissioned, unarmed

---

[1] R. Docs. 100; 115 (reply memorandum).
[2] R. Doc. 108.
[3] La. R.S. 33:2740.3(A).

1

force of uniformed hospitality professionals" called "Public Safety Rangers" (the "Rangers").[4] According to a recent online job posting, the Rangers' duties include such activities as "[a]nswering questions about Downtown New Orleans . . . such as directions, recommendations, and explanations of the DDD's services . . .[, r]esponding to immediate non-emergency, quality-of-life needs[,]" and "reporting quality-of-life issues to the appropriate City Services."[5] Importantly, the Rangers are *not* law enforcement personnel—DDD employs a fully separate "patrol unit of armed, uniformed officers" to provide "enhanced enforcement coverage" in the District.[6] Rather, the Rangers "act as extra eyes and ears for the police" as they patrol the neighborhood on foot and by bicycle.[7] Essentially, in addition to helping lost tourists and unhappy locals, the Rangers are intended to deter criminal activity in the Downtown New Orleans community via their observant presence and reporting back to law enforcement—not by fighting crime or attempting to enforce the law themselves.

Jordan, who is White, was hired as a Ranger by DDD in October 2018 and terminated only four months later.[8] He filed the instant suit on July 7, 2021, asserting multiple claims arising from this employment and termination against DDD, as well as several other defendants.[9] The majority of those claims have already been dismissed by the Court for failure to state a claim for which relief can be granted.[10] DDD now moves the Court to grant summary judgment in its favor as to Jordan's remaining allegations, brought pursuant to Title VII of the Civil Rights Act,[11] that DDD

---

[4] R. Doc. 100-2 at 2.
[5] Downtown Development District, *Public Safety Ranger* (2023), WWW.DOWNTOWNNOLA.COM, https://downtownnola.com/wp-content/uploads/2023/08/Rangers-Job-Description-8.23.pdf (last visited March 16, 2024).
[6] R. Doc. 100-2 at 2; *see also* R. Doc. 108-2 at 1.
[7] R. Doc. 100-2 at 2.
[8] R. Doc. 108-2 at 1.
[9] R. Doc. 1.
[10] *See* R. Doc. 42.
[11] 42 U.S.C. § 2000e, *et seq.*

2

discriminated against him by creating a hostile workplace environment in which Jordan was subjected to race-based harassment, and that his termination constituted discriminatory disparate treatment and retaliation in violation of that statute.[12] DDD argues Jordan cannot adequately prove essential elements of each claim and thus that its Motion for Summary Judgment must be granted, and Jordan's case dismissed in its entirety.[13]

## II.   APPLICABLE LAW

Summary judgment of a claim is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[14] A court must hold "a factual dispute to be 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party and a fact to be 'material' if it might affect the outcome of the suit under the governing substantive law."[15] When assessing whether a genuine dispute as to any material fact exists, courts "consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence."[16] Accordingly, at the summary judgment stage, courts must view the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.[17]

Of course, "unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary

---

[12] R. Doc. 100-1.
[13] *Id.*
[14] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).
[15] *Voelkel McWilliams Const., LLC v. 84 Lumber Co.*, 2015 WL 1184148, at *5 (E.D. La. Mar. 13, 2015) (quoting *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989)).
[16] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).
[17] *See, e.g.*, *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 727 (5th Cir. 2018) (quoting *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 603 (2015); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

judgment."[18] Although the movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, if it can carry that burden, the nonmoving party must "go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial."[19] This burden is not satisfied by "metaphysical doubt as to the material facts" or only a "scintilla" of evidence.[20] Summary judgment must thus be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[21] As the United States Supreme Court has explained, "[i]n such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[22] Courts "do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[23] Thus, "summary judgment is appropriate in *any* case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'"[24]

### III. DISCUSSION AND ANALYSIS

Title VII prohibits an employer from discriminating against any individual "because of such individual's race, color, religion, sex, or national origin."[25] Here, Jordan raises three claims under Title VII, asserting (1) he was subjected to race-based workplace harassment during his four months as a Ranger, constituting a hostile work environment; (2) DDD's termination of his

---

[18] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (internal quotation and citation omitted).
[19] *Celotex*, 477 U.S. at 323–24.
[20] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082 (5th Cir.1994)).
[21] *Celotex*, 477 U.S. at 322.
[22] *Id.* at 322–23.
[23] *Little*, 37 F.3d at 1075 (emphasis removed).
[24] *Id.* (quoting *Armstrong v. City of Dallas,* 997 F.2d 62 (5th Cir. 1993) (emphasis original)).
[25] 42 U.S.C. § 2000e-2.

4

employment constitutes disparate treatment discrimination; and (3) that he was terminated in retaliation for exercising protected rights. DDD argues trial need not be held in this matter and the Court should summarily enter judgment in its favor because Jordan cannot prove at least one essential element of all three claims. The Court will discuss each claim in turn.

### A. Hostile Work Environment

To prevail on a Title VII claim for a racially hostile work environment, a plaintiff must show: "(1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; [and] (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action."[26] DDD argues there is no genuine issue of material fact necessitating trial on Jordan's hostile work environment claim because, *inter alia*, he cannot adequately show the harassment he alleges affected any term, condition, or privilege of his employment.

To satisfy this prong, the harassment "must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment[,]"[27] and "must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so."[28] Courts have recognized that determining whether conduct is sufficiently severe or pervasive to create an abusive work environment is "not an exact science[,]" given that both an isolated incident of

---

[26] *Arredondo v. Elwood Staffing Services, Incorporated*, 81 F.4th 419, 433 (5th Cir. 2023) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).
[27] *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 479 (5th Cir. 2008) (quoting *Lauderdale v. Tex. Dep't of Criminal Justice*, 512 F.3d 157, 163 (5th Cir. 2007) (alteration original)).
[28] *Johnson v. Bd. of Supervisors of Louisiana State Univ. & Agric. Coll.*, 2022 WL 4605138, at *4 (E.D. La. Sept. 30, 2022), *aff'd sub nom. Johnson v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, 90 F.4th 449 (5th Cir. 2024) (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005)).

discriminatory harassment, if egregious, and milder racial harassment, if frequently repeated, can meet this standard.[29] The Supreme Court has thus explained that "no single factor is required[,]" but "whether an environment is 'abusive' or 'hostile' can be determined only by looking at all the circumstances[,]" including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[30]

In support of his claim that DDD subjected him to a racially hostile work environment in violation of Title VII, Jordan asserts he was subjected to "continual tirades in the DDD's breakroom" by Ranger Captain Supervisor Keith Davis, who is African American, in which Davis would "rant and rave against racist White people, the KKK, Donald Trump, racist White people that voted for Donald Trump, and racist White police officers that shoot Black people because they hate them" while Jordan was the only White person in the room.[31] Jordan also claims other African American Rangers "refused to work with [him] because he is White and they had been turned against [him]" by listening to these "rants" by Davis,[32] and that another Ranger told him Davis had said they "better watch out for that white boy because he's showing you all up[.]"[33] Even if the Court assumes these comments can constitute race-based harassment, the conduct Jordan alleges "'pale[s] in comparison, both in severity and frequency,' to the kinds of verbal harassment that [the Fifth Circuit] and other circuits have held would support a Title VII hostile work environment claim."[34] As the Supreme Court has explained, Title VII is not a "general civility

---

[29] *Johnson*, 2022 WL 4605138, at *4 (citing *Lauderdale*, 512 F.3d at 163).
[30] *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993).
[31] R. Doc. 108-1 at 1–2.
[32] *Id.* at 9.
[33] R. Doc. 100-6 at 8.
[34] *White v. Gov't Emps. Ins. Co.*, 457 F. App'x 374, 381 (5th Cir. 2012) (per curium) (quoting *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007) (collecting cases)).

code[,]" and is not intended to protect employees against the "ordinary tribulations of the workplace, such as the sporadic use of abusive language, [protected class]-related jokes, and occasional teasing."[35] "[S]econd-hand harassment is less objectionable than harassment directed at the plaintiff."[36] Even "utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII."[37] Rather, allegedly harassing conduct "must be *extreme* to amount to a change in the terms and conditions of employment."[38]

The Fifth Circuit has held "[d]iscriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of [a] victim's employment and create an abusive working environment that violates Title VII."[39] In a pinnacle case, *Walker v. Thompson*, the Circuit reversed a district court's grant of summary judgment to an employer defendant on a Title VII race-based hostile work environment claim in which the plaintiffs had suffered years of inflammatory racial epithets, including being called "n*****s" and "little black monkeys," and were the frequent victims of "comparisons to slaves and monkeys, derisive remarks regarding their African heritage, [and] patently offensive remarks regarding the hair of African-Americans[.]"[40] The district court held this discrimination insufficiently severe or pervasive to create an objectively hostile work environment, reasoning that the comments were "simply truly offensive" but not "physically threatening or humiliating, nor did they unreasonably interfere with [the plaintiff employees]'s work."[41] The Circuit disagreed, holding that, under those circumstances, the

---

[35] *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted).
[36] *Arredondo*, 81 F.4th at 433.
[37] *Id.* (citing *Harris*, 510 U.S. at 21).
[38] *Faragher*, 524 U.S. at 788 (emphasis added).
[39] 214 F.3d 615, 626 (5th Cir. 2000), *abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006) (quoting *Wallace v. Texas Tech University,* 80 F.3d 1042, 1049 n. 9 (5th Cir. 1996)).
[40] *Walker*, 214 F.3d at 626.
[41] *Id.*

7

plaintiffs had successfully created a fact issue with respect to whether the racial insults they endured were sufficiently severe or pervasive to alter the conditions of employment and create a hostile or abusive work environment.[42] In other words, the Fifth Circuit held the conduct to which the plaintiffs in *Walker* alleged they were subjected was sufficiently "extreme" to constitute "severe or pervasive" racial harassment rising to the level of creating an actionable hostile work environment under Title VII.

Of course, *Walker* is not the floor. More recent Fifth Circuit decisions discussing this issue have held the same as to somewhat less "extreme" conduct. For example, in *E.E.O.C. v. WC&M Enterprises, Inc.*, the Circuit held a reasonable jury could conclude the harassment at issue was severe or pervasive where a plaintiff, an Indian Muslim, was regularly called "Taliban" and "Arab" by coworkers, who also told him to "just go back where [he] came from" and insinuated that he had been involved in the September 11, 2001 terrorist attack in New York City.[43] It reversed the district court's summary judgment ruling, emphasizing that "a pattern of frequent verbal ridicule or insults sustained over time can constitute severe or pervasive harassment sufficient to violate Title VII."[44] Similarly, in *Johnson v. PRIDE Industries, Inc.*, the Circuit found a genuine issue of material fact as to severity or pervasiveness where a superior coworker frequently called the Black plaintiff "mijo" or "manos"—relating the use of these diminutives to the racist history of calling Black men "boy"—twice used the Spanish-language equivalent of "n*****" to refer to him in conversation with others, and regularly used racially offensive language in general.[45]

---

[42] *Id.*
[43] 496 F.3d 393, 400 (5th Cir. 2007).
[44] *Id.*
[45] 7 F.4th 392, 400–04 (5th Cir. 2021).

The conduct presented in this case is plainly far less extreme. Jordan states he "inferred" or "believe[d]"[46] Davis's breakroom tirades against "racist White people that voted for Donald Trump," were directed at him. But Jordan admits Davis never called him a racist White person[47] and did not know who he had voted for.[48] Jordan admits he simply "believe[d] he was talking about white people in general" and "was the only white person in the room[.]"[49] Jordan claims other African-American Rangers refused to work with him because they had been "turned against" him by Davis's remarks about racist White people,[50] but he admits no coworker ever told him they didn't want to work with him because he was White.[51] Jordan states a coworker informed him Davis told a group of African-American Rangers shortly after Jordan was hired by DDD that they "better watch out for that white boy because he's showing you up."[52] Jordan states he "took this to mean Keith Davis was trying to undermine" him with his African-American coworkers and tell them "do not be friendly with him[,]" but admits the statement can also be understood as a compliment—i.e., that Davis thought Jordan was doing a good job as a Ranger.[53] Jordan does not claim Davis ever spoke to him or treated him in a racially derogatory manner, nor even to have heard second-hand of any other even arguably negative, race-based comment by Davis referencing him.

Even taking the facts in the light most favorable to Jordan and drawing all reasonable inferences in his favor, and even with the benefit of liberal construction granted to the *pro se* litigant, the Fifth Circuit has affirmed summary judgment of Title VII race-based hostile work

---

[46] R. Doc. 100-6 at 9–10.
[47] *Id.* at 9.
[48] *Id.* at 12.
[49] *Id.* at 10.
[50] R. Doc. 1 at 20.
[51] R. Doc. 100-6 at 6–7.
[52] R. Doc. 100-5 at 12.
[53] R. Doc. 100-5 at 14–15.

environment claims based on more "extreme" conduct as insufficiently severe or pervasive. For example, in *Cavalier v. Clearlake Rehabilitation Hosp., Inc.*, the Circuit agreed the Black plaintiff's allegation that he had been repeatedly called "boy" by a supervisor, who also threatened to "beat the tar off of him[,]" did not rise to the level of severity or pervasiveness to be actionable under Title VII. [54] It reached the same conclusion in *Johnson v. TCB Const. Co.*, in which a Black plaintiff's supervisor had directly called him a "damn n*****" on one occasion and regularly used that derogatory epithet in general workplace conversation.[55] Here, even if Jordan is correct to have "inferred," as the only white person in the room, that when Davis referenced "racist White people," or "KKK members," Davis was directing those comments at him, implying that he was a member of those groups, or that all white people are, Jordan was not subjected to slurs, racial epithets, or even any direct racially-related insults by Davis. He was not humiliated or threatened. At most, Jordan was made to listen to Davis making negative statements about people of his race while he was in the DDD breakroom some number of times over a period of four months. Jordan was clearly offended by Davis's statements, perhaps rightly. But even assuming Jordan can prove he was racially harassed by Davis, no genuine issue of material fact exists as to whether such harassment was sufficiently severe or pervasive or pervasive to implicate Title VII. Under clear Fifth Circuit precedent, it was not. The entry of summary judgment for DDD is appropriate on this claim.

### B. DISPARATE TREATMENT

After only four months as a Ranger, Jordan was fired. Jordan claims his termination constituted disparate treatment discrimination on the basis of his race in violation of Title VII, asserting DDD fired him so Davis could "continue making racist comments about Whites in the

---

[54] *Cavalier v. Clearlake Rehabilitation Hosp., Inc.*, 306 F. App'x. 104, 105–06 (5th Cir. 2009) (per curium).
[55] *Johnson v. TCB Const. Co.*, 334 F. App'x. 666, 670 (5th Cir. 2009) (per curium).

DDD breakroom to other African American Rangers and no one will be there to complain[.]"[56] DDD's explanation is very different: it states it fired Jordan for "repeated instances" of "acting in a law enforcement capacity" in violation of DDD's policies and training, which resulted in several physical altercations with members of the public.[57]

A plaintiff asserting a claim for disparate treatment discrimination under Title VII must first establish a prima facie case for discrimination, which requires a showing that he "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside [his] protected group or was treated less favorably than other similarly situated employees outside the protected group."[58] Under the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, if the plaintiff carries that burden, it then shifts back to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.[59] If it can do so, the burden shifts back to the plaintiff to show that this non-discriminatory reason is mere pretext for his employer's true discriminatory motives.[60]

Here, it is uncontested that Jordan is a member of a protected group, that he was qualified to be a Ranger, and that he was terminated from that position. The parties dispute only the fourth element: whether DDD replaced Jordan with a new, non-White Ranger, or was treated less favorably other than similarly situated, non-White Rangers by being fired when they were not.

---

[56] R. Doc. 108 at 18.
[57] R. Doc. 100-4 at 2; *see also* R. Docs. 100-2; 100-3.
[58] *Harrison v. Brookhaven School District*, 82 F.4th 427, 429 (5th Cir. 2023) (citation omitted).
[59] 411 U.S. 792, 802 (1973).
[60] *Id* at 804.

Jordan makes both arguments.[61] In support of his claim that DDD replaced him with a new, non-White employee, Jordan asserts that, in the "month or so following" his termination, he ran into a Ranger training an "unidentified elderly African American male[.]"[62] However, DDD has provided a signed affidavit from its President and Chief Executive Officer Devon Barbour, attesting that, it February 2019, in addition to firing Jordan, it fired an African-American Ranger, and another African-American Ranger resigned.[63] Subsequently, in March and April of 2019, DDD hired three new Rangers with the same racial make-up: one White and two African-American, with no one individual directly replacing another.[64] Jordan presents no evidence to counter Barbour's sworn statement, but merely questions its veracity.[65] Even viewing these facts in the light most favorable to Jordan, his witnessing a new African American Ranger being trained in the months after his termination, standing alone, is insufficient to carry his burden to show that DDD replaced him with someone outside of his protected class.

In the alternative, Jordan argues he was treated less favorably than other similarly situated employees who were not White, asserting that fellow African American Rangers Patrick Holden and Jarren Abron were involved in physical altercations with the public similar to Jordan's, but were not terminated for their actions.[66] To satisfy the "similarly situated requirement, a plaintiff must show that he was treated less favorably than others 'under nearly identical' circumstances."[67] The Fifth Circuit has explained that identical circumstances exist when "the employees being compared held the same job or responsibilities, shared the same supervisor or had their

---

[61] *See* R. Doc. 108 at 19–23.
[62] *Id.* at 22.
[63] R. Doc. 100-2 at 3.
[64] *Id.* at 2–3.
[65] R. Doc. 108 at 22–23.
[66] *Id.* at 19.
[67] *Morris v. Town of Independence*, 827 F.3d 396, 401 (5th Cir. 2016) (citing *Willis v. Cleco Corp.*, 749 F.3d 314, 319 (5th Cir. 2014)).

employment status determined by the same person, and have essentially comparable violation histories."[68] DDD argues Holden and Abron are not similarly situated to Jordan because they "each had a minor, isolated incident where they had to use defensive force."[69] On the other hand, Jordan was involved in three altercations with the public in the span of only two months as a Ranger, during which DDD also received reports from a homeless man that Jordan had threatened him with a collapsible baton,[70] and from another Ranger that Jordan had kicked a homeless man.[71]

First, on January 5th, 2019, Jordan inserted himself in a New Orleans Police Officer's ("NOPD") attempt to subdue an unstable individual by chasing him ahead of the officer, tackling him from behind, and wrestling him to the ground.[72] During that altercation, Jordan injured his hand.[73] After reporting the incident to his supervisors, Jordan was reminded that Rangers are not law enforcement personnel, that what he had done was against their policies, and avoid physical interactions in the future.[74] A few weeks later, Jordan became involved in a verbal altercation with a homeless person who Jordan asserts became "hostile" after Jordan asked him to move from blocking the sidewalk.[75] Jordan states he "pushed him back[,]" after which the man swung at him with a guitar. Jordan then "push[ed] him back forcefully[,] causing the man to fall to the ground, hit his head, and begin bleeding, and require ambulance transportation to the hospital.[76] Finally, in February 2019, Jordan confronted a man he suspected of selling drugs and ordered him to leave

---

[68] *Id.* (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009).

[69] R. Doc. 100-1 at 16.
[70] R. Docs. 100-3 at 2–3; 100-4 at 3.
[71] R. Doc. 108 at 12.
[72] R. Doc. 100-6 at 21–24.
[73] *Id.* at 27.
[74] *Id.* at 31; R. Doc. 100-3 at 3.
[75] R. Doc. 100-6 at 35.
[76] *Id.* at 36.

the area, resulting in the man becoming angry and threatening to shoot Jordan.[77] Jordan was fired by DDD only two or three days following this final incident.[78]

On this basis, DDD argues Jordan was fired not because he is White and Holden and Abron are not, but because Jordan was involved in multiple violent physical altercations with the public; whereas Holden and Abron were involved only in isolated incidents of defensive violence.[79] Further, Holden and Abron did not violate a DDD policy by repeatedly acting in a law enforcement capacity in violate of training and supervisory direction and thereby endangering the safety of themselves and the public.[80]

Even considering the facts in the light most favorable to him, Jordan has not shown that he is similarly situated to Holden and Abron. By his own deposition testimony, Jordan was involved in at least three altercations with members of the public that became violent or dangerous and that were initiated and escalated by Jordan. In contrast, Abron was involved in a sole incident in which he aided police in detaining an individual only after he had swung a fist at Abron twice.[81] Holden was involved in two physical altercations, but, in both instances, Holden was struck by the other individual and responded in self-defense.[82] Jordan does not have an "essentially comparable violation history" with Holden and Abron; accordingly, the circumstances under which Jordan was terminated, and Holden and Arbon not, are not "nearly identical." Thus, Holden and Abron are not "similarly situated" to Jordan. Jordan cannot show that he was replaced by a non-White individual, nor that he was treated less favorably than similarly situated, non-White employees, and has thus

---

[77] *Id.* at 38-39.
[78] *Id.* at 44–45.
[79] R. Doc. 100-1 at 15–16.
[80] *Id.*
[81] R. Doc. 100-8.
[82] R. Doc. 108-2 at 10.

failed to establish a prima facie case for discrimination. The entry of summary judgment for DDD is appropriate on this claim as well.

### C. RETALIATION

Finally, Jordan claims DDD terminated him in retaliation for exercising his right to report Davis's allegedly racially discriminatory conduct to his superiors. Title VII makes it unlawful for an employer to retaliate against, or discharge, an employee who opposes an employment practice that violates Title VII.[83] To prevail on such a claim for retaliation under Title VII, a plaintiff must show that, "(1) he engaged in conduct protected by Title VII; (2) he suffered a materially adverse action; and (3) a causal connection exists between the protected activity and the adverse action."[84] Summary judgment is proper if a plaintiff fails to support any of these three elements.[85] This analysis also proceeds according to the *McDonnell Douglas* burden-shifting analysis described *supra*.[86]

The parties contest only the final element: whether any causal connection exists between Jordan's complaints about Davis's conduct and his termination. Jordan argues the temporal proximity between his reporting Davis and being fired, approximately three days, clearly evidences a connection, notwithstanding the fact that Jordan's final violent altercation with the public also occurred two or three days prior to Jordan's termination.[87] Although the Fifth Circuit has held in the past that temporal proximity between a protected activity and the alleged retaliation can be enough to establish causation under certain circumstances,[88] it has explicitly overturned

---

[83] 42 U.S.C. § 2000e–3(a).
[84] *Cabral v. Brennan*, 853 F.3d 763, 766-67 (5th Cir. 2017) (citing *Jenkins v. City of San Antonio Fire Dep't*, 784 F.3d 263, 269 (5th Cir. 2015)).
[85] *Hunt v. Rapides Healthcare Sys. LLC*, 277 F.3d 757, 766–67 (5th Cir. 2001).
[86] *McDonnell Douglas Corp*, 411 U.S. at 802.
[87] R. Doc. 108 at 18.
[88] *See Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 948 (5th Cir. 2015).

that standard, stating that "the burden has now shifted to a heightened standard of 'but-for' causation, for which temporal proximity, without more, will not suffice."[89] In light of Jordan's repeated violent physical altercations with the public, which also occurred in close proximity with his termination, Jordan cannot show that "but-for" his complaints about Davis, DDD would not have fired him. Accordingly, Jordan cannot establish an essential element of his retaliation claim, no trial need be held, and summary judgment is properly entered in DDD's favor.

## IV. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendant Downtown Development District's Motion for Summary Judgment, R. Doc. 100, is **GRANTED**. Judgment shall be entered forthwith in favor of DDD on all claims raised by Jordan against it in this action.

New Orleans, Louisiana, this 19th day of March, 2024.

Greg Gerard Guidry
United States District Judge

---

[89] *Hernandez v. Metro. Transit Auth. of Harris Cnty.*, 673 F. App'x 414, 420 (5th Cir. 2016) (citing *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007)).